Stacia WOODEN, Appellant,

v.

UNITED STATES, Appellee.

No. 07–CF–308.

District of Columbia Court of Appeals.

Argued April 22, 2010.
Decided Oct. 28, 2010.

Christine A. Monta, Public Defender Service, with whom James Klein and Sa-

mia Fam, Public Defender Service, were on the brief, for appellant.

Patricia A. Heffernan, Assistant United States Attorney, with whom Channing D. Phillips, Acting United States Attorney at the time the brief was filed, and Roy W. McLeese III, Assistant United States Attorney, were on the brief, for appellee.

Before RUIZ, Associate Judge, and FERREN and SCHWELB, Senior Judges.

FERREN, Senior Judge:

■ The Second Amendment provides in part: "... the right of the people to keep and bear Arms, shall not be infringed."[1] In this case, appellant contends that her conviction for carrying a dangerous weapon (CDW)[2]—a knife—should be reversed because the court's instruction to the jury violated the Second Amendment. How? By permitting the jury to convict if appellant "intended to use the [knife] as a dangerous weapon,"[3] even if her only purpose was to have it ready for "lawful self-defense."[4] Because appellant did not make this claim at trial, both parties agree that we review for plain error.[5] Finding none, we affirm.

## I.

The altercation at issue occurred between appellant, Stacia Wooden (the wife of John Cunningham), and Victoria Thomas (Cunningham's former girlfriend, with whom he had a daughter). The animosity between them was attributable primarily to appellant's learning that Thomas was still sexually involved with Cunningham. That led to a fight between them in late March of 2005, when Thomas, according to her own testimony, saw "a knife on the ground" and "picked the knife up," but "stopped" after Cunningham's mother intervened and "cut her finger" on it.

Tempers cooled over the next two months, but the animosity flared up as a rivalry developed between appellant and Thomas over caring for Cunningham's grandmother, Emma Cunningham. According to the government's evidence, on May 23, 2005, appellant was speaking with Emma over the telephone, insisting that she get ready for "day camp" (an elder care program), when Thomas, already at Emma's house, intercepted the call from a hall telephone. That morning, Emma had told Thomas that her "heart hurt," and

---

1. U.S. CONST. amend. II.

2. D.C.Code § 22–4504(a) (2001) ("No person shall carry within the District of Columbia either openly or concealed on or about their person, a pistol, without a license issued pursuant to District of Columbia law, *or any deadly or dangerous weapon capable of being so concealed.*") (emphasis added).

3. The court instructed the jury on the elements of the CDW offense as follows:

    One, that the defendant carried a deadly or dangerous weapon openly or concealed on or about her person; two, that she carried the weapon knowingly and intentionally.... *Three, that she intended to use the object as a dangerous weapon;* and, four, that the object could be concealed; and, five, that the defendant carried the deadly

or dangerous weapon in a place other than her home, place of business, or land or premises possessed and controlled by her. (Emphasis added.)

4. Appellant's opening brief at 3.

5. For reversal, there must be [1] "error" that is [2] "plain" (meaning "clear" or "obvious"), that [3] "affects substantial rights," and that, if not corrected, [4] would result in a "miscarriage of justice" (meaning conviction of an innocent defendant) or otherwise would "seriously affect[ ] the fairness, integrity or public reputation of judicial proceedings." *United States v. Olano,* 507 U.S. 725, 732–36, 113 S.Ct. 1770, 123 L.Ed.2d 508 (1993); *Wilson v. United States,* 785 A.2d 321, 326 (D.C.2001) (same).

Thomas assured her, after appellant's call, that Thomas would take Emma to the hospital. As Thomas was going downstairs to retrieve her car, appellant entered the foyer through the front door. The two began to argue: appellant for day camp, Thomas for the hospital. Thomas stepped toward appellant, who then threw hot coffee on Thomas's face. A physical struggle began, and the women carried the fight outside onto the porch.

According to the neighbor from next door, Linda Durett, the two were leaning against a brick half-wall that divided grandmother Emma's house from Durett's. Durett saw that Thomas "was bleeding from her forehead" and that appellant had "a little knife in her hand." Durett screamed. John Cunningham's brother, Jamel McCormick, came out of the house and took the knife from appellant, whereupon Durett's son, Troy, came out of his house and broke up the fight.

## II.

Under the CDW statute, as the jury was instructed,[6] a defendant may be convicted for knowingly and intentionally carrying a deadly or dangerous weapon, openly or concealed on or about the person, with an intent to use it as a dangerous weapon—even though the intended dangerous use is limited to an anticipated need for self defense. Wooden expressly concedes this. According to his opening brief, "at the time of trial it was clearly settled that a defendant to a CDW charge could not claim self-defense to justify possession of the weapon before the need for self-defense arose";[7] the law "clearly supported"[8] the judge's CDW instruction to the jury. To explain that acknowledgment, counsel for Wooden cited this court's 1982 decision in *McBride*, in which we said: "A person who possesses a 'dangerous weapon' in good faith anticipation of a need to use it in self-defense may be guilty of a general-intent weapons offense," such as CDW.[9] Accordingly, Wooden did not challenge the CDW instruction at trial because counsel perceived no statutory grounds for doing so.[10]

Because we review for plain error, the question presented is whether the Second Amendment "clearly" or "obviously" incorporates a right to carry a dangerous weapon, here a knife, with an intention to use it only, if necessary, for the lawful purpose of self-defense. Put another way, is it clear or obvious that the Second Amendment trumps *McBride's* observation that carrying a dangerous weapon solely for purposes of anticipatory self-defense is unlawful?

▮ In *District of Columbia v. Heller*,[11] the Supreme Court held that the District of Columbia's "ban on handgun possession in the home violates the Second Amendment, as does its prohibition against rendering any lawful firearm in the home operable for the purpose of immediate self-defense."[12] The Court concluded that the

---

6. *Supra* note 3.

7. Appellant's opening brief at 21.

8. Appellant's opening brief at 11.

9. *McBride v. United States*, 441 A.2d 644, 649 n. 9 (D.C.1982); *see id.* at 648 nn. 5 & 6; *accord, Johnson v. United States*, 452 A.2d 959, 961 (D.C.1982) (per curiam) ("'A defendant in a [weapons] prosecution ... cannot claim self-defense to justify possession of the

weapon before its use in self-defense.'") (quoting *McBride*, 441 A.2d at 650 n. 11), *quoted in* appellant's opening brief at 11 n. 9.

10. See appellant's opening brief at 11.

11. —— U.S. ——, 128 S.Ct. 2783, 171 L.Ed.2d 637 (2008).

12. *Id.* at 2821–22. The first (handgun possession) clause of the Court's holding limits the enforcement of D.C.Code §§ 7–2501.01(12), –

Second Amendment "guarantee[s] the individual right to possess and carry weapons in case of confrontation," [13] and it stressed that self-defense is "the central component of the right itself." [14] Moreover, "the Second Amendment extends, prima facie, to all instruments that constitute bearable arms, even those that were not in existence at the time of the founding." [15]

On the other hand, the Court recognized limitations:

Like most rights, the right secured by the Second Amendment is not unlimited. From Blackstone through the 19th-century cases, commentators and courts routinely explained that the right was not a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose. [Citations omitted.] For example, the majority of the 19th-century courts to consider the question held that prohibitions on carrying concealed weapons were lawful un-

der the Second Amendment or state analogues.[16]

Furthermore, the Court appeared to agree with an earlier decision, *United States v. Miller*,[17] to this extent: "the sorts of weapons protected were those 'in common use at the time,' " [18] a limitation "fairly supported by the historical tradition of prohibiting the carrying of 'dangerous and unusual weapons.' " [19] Thus, "the Second Amendment does not protect those weapons not typically possessed by law-abiding citizens for lawful purposes, such as short-barreled shotguns. That accords with the historical understanding of the scope of the right[.]" [20]

### III.

Although appellant's trial preceded *Heller*, all parties agree that, in evaluating plain error, the Supreme Court's decision in *Johnson v. United States* [21] controls:

---

2502.01(a), –2502.02(a)(4), 22–4504(a), and 22–4506. The second (firearm operability) clause refers to the Court's striking down a statutory requirement that residents "keep their lawfully owned firearms, such as registered long guns, 'unloaded and disassembled or bound by a trigger lock or similar device' unless they're located in a place of business or are being used for lawful recreational activities. *See* [D.C.Code] § 7–2507.02." *Id.* at 2788.

13. *Heller, supra* note 11, 128 S.Ct. at 2797. The Court added that the Second Amendment did not confer a right; it "codified a pre-existing right." The text of the amendment "implicitly recognizes the pre-existence of the right and declares only that it 'shall not be infringed.' " *Id.* at 2797–98.

14. *Id.* at 2801 (emphasis omitted).

15. *Id.* at 2791–92.

16. *Id.* at 2816.

17. 307 U.S. 174, 177, 59 S.Ct. 816, 83 L.Ed. 1206 (1939) (in absence of evidence that possession or use of short-barrel shotgun has

some reasonable relationship to preservation or efficiency of well regulated militia, Second Amendment does not guarantee right to keep and bear such instrument).

18. *Heller, supra* note 11, 128 S.Ct. at 2817 (quoting *Miller, supra* note 17, 307 U.S. at 179, 59 S.Ct. 816).

19. *Id.* (quoting Blackstone).

20. *Id.* at 2815–16. The Court concluded its discussion of limitations by stressing that "nothing in our opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons and the mentally ill, or laws forbidding the carrying of firearms in sensitive places such as schools and government buildings, or laws imposing conditions and qualifications on the commercial sale of arms. We identify these presumptively lawful regulatory measures only as examples; our list does not purport to be exhaustive." *Id.* at 2816–17 & n. 26.

21. 520 U.S. 461, 117 S.Ct. 1544, 137 L.Ed.2d 718 (1997).

"where the law at the time of trial was settled and clearly contrary to the law at the time of appeal[,] it is enough that an error be 'plain' at the time of appellate consideration." [22] Appellant acknowledges that the CDW instruction pursuant to which she was convicted reflected settled law and argues that it is clearly contrary to *Heller,* now applicable to her case.

Appellant argues more specifically, in light of *Heller,* that reversal and remand are required to permit the trial court to fashion jury instructions recognizing that (1) a knife, like a gun, is entitled to Second Amendment protection—even when intended for dangerous use—if held solely for purposes of self-defense; that (2) although "dangerous and unusual weapons" [23] are not covered by the Second Amendment, the legislature has not necessarily excluded the kind of knife at issue here from such protection; that (3) although the Second Amendment may not protect possession of concealed weapons, the CDW statute [24] and jury instructions,[25] as currently crafted, require narrowing because they authorize conviction for weapons carried openly, as well as concealed, and thus permit conviction for carrying protected, as well as unprotected, weapons; and, finally, that (4) *Heller* does not limit Second Amendment protection to weapons possessed for use in defense of the home.[26]

In short, appellant contends that we must impute error to the trial court's failure to fashion CDW instructions that incorporated the aforementioned four concepts. She says that if the jury had been properly instructed, it could not have lawfully convicted if it found that, solely for self-defense, she had carried openly, and outside the home, a knife that was not expressly outlawed. Absent proper instructions, stresses appellant, the current record is inadequate; evidentiary ambiguities as to the type of knife, for example, or as to whether the knife was carried openly or concealed, are meaningless because the jury was never asked to come to grips with these *Heller* issues. For that reason, appellant concludes, the court cannot simply undertake plain error review by evaluating the evidence in the light most favorable to the government from an undeveloped record.

Accepting appellant's framework for analysis, can we say that the trial court's failure to give her suggested instructions

22. *Id.* at 468, 117 S.Ct. 1544; *Perez v. United States,* 968 A.2d 39, 93 (D.C.2009) (quoting *Johnson* ).

23. *Heller, supra* note 11, 128 S.Ct. at 2817.

24. *Supra* note 2.

25. *Supra* note 3.

26. In challenging the CDW statute and instructions, appellant does not appear to be making a facial challenge; in the briefs, her argument stresses that the statute, as applied, violated the Second Amendment because the third element of the jury instruction permitted conviction for carrying a knife intended solely for self-defense. At oral argument, however, counsel expanded appellant's position by making a facial attack on the statute, contending that it is void under the Second Amendment, more broadly, because it authorizes conviction for carrying every kind of dangerous weapon intended for any purpose whatsoever, including lawful ones—an argument that makes consideration of the type of weapon carried, or the place where it is carried, irrelevant. Although this argument comes too late, we can say that it amounts to the constitutional "overbreadth" argument that we have rejected in previous cases challenging other weapons statutes. *See, e.g., Plummer v. United States,* 983 A.2d 323, 339–40 (D.C.2009) (carrying a pistol without a license; possession of an unregistered firearm); *Brown v. United States,* 979 A.2d 630, 638–40 (D.C.2009) (carrying a pistol without a license).

amounts to "error" that was "plain"—that is, "clear" and "obvious"?

Two of appellant's four instructional concerns call for jury findings as to whether her actions were exceptions to—that is, fell short of—the Second Amendment's reach. She argues that the jurors did not receive proper instructions requiring them to find whether her knife was protected by *Heller* (or instead was disqualified as "dangerous" or "unusual").[27] Nor was the jury instructed to find whether she had carried the knife openly or concealed (and thus not constitutionally protected).[28] These two concerns addressed to Second Amendment exceptions, however, become relevant only if appellant's two basic propositions are sound, namely, that *Heller* "clearly" or "obviously" extends Second Amendment protection to knives *and* to carrying them exclusively for purposes of self-defense outside the home.

## IV.

■ *Heller* concerned handguns as well as long guns "for self-defense in the home."[29] What about knives? The word "knife" appears in *Heller* only once, where the opinion references a book on pacifism speculating that Quaker frontiersmen, "forbidden to use arms to defend their families,"[30] must have been tempted on occasion " 'to seize a hunting rifle or a knife in self-defense.' "[31] *Heller* also references "bows and arrows" (twice)[32] and

27. As to the knife—which the police never recovered and was therefore not in evidence—appellant testified that the one she carried was on a "key chain clip" that also had a "bottle opener" and "two screwdrivers" on it. The government's witness, however, Jemal McCormick—who took the knife away from appellant—rejected the key chain description and characterized the weapon as a "pocket flip knife." McCormick testified that the blade was three to four inches long, that it was "actually inside the handle," and that "you flip it open." The government has called it a "switchblade" knife, banned in interstate commerce as a common tool of criminals. *See* 15 U.S.C. § 1242 (2006); *United States v. Nelsen*, 859 F.2d 1318, 1318–19 (8th Cir.1988); *Crowley Cutlery Co. v. United States*, 849 F.2d 273, 278 (7th Cir.1988). Even taking the evidence in the light most favorable to the government, we cannot say for sure that the knife its witness described was assuredly a forbidden switchblade. Nor can we say that it assuredly was not. Appellant is therefore correct that if the "forbidden knife" issue becomes relevant, the present record affords no basis for resolving it, as neither counsel nor the jurors addressed the knife's nature in the detail required for a *Heller* finding.

28. As in the case of the knife, the "concealment" issue cannot be resolved on this record. According to the government's evidence, appellant acknowledged in court that the knife fit into the pocket of a jacket she had been wearing during the fight—evidence permitting an inference that she had concealed the knife there. Moreover, there is no evidence to indicate that anyone saw the knife on appellant until a neighbor, Linda Durett, noticed blood on Thomas's forehead and then saw "a little knife" in appellant's hand. Maintaining that the knife was on her key chain, appellant herself testified that she had carried the key chain "in my hand," allowing an inference of concealment of a "little knife." Finally, there was no defense evidence that appellant had been carrying the knife openly. Although the evidence presented leaves little room for a finding that appellant had been carrying the knife openly (and thus arguably subject to *Heller* protection), we must note again that the concealment issue was not joined before the jury, and thus the present record cannot serve as a definitive basis for resolving that issue were it to become relevant.

29. *Heller, supra* note 11, 128 S.Ct. at 2818.

30. *Id.* at 2796.

31. *Id.* (citing P. Brock, Pacifism in the United States 359 (1968)).

32. *Id.* at 2791, 2795.

"swords" (once).[33] Then there is the Supreme Court's earlier decision in *Miller*,[34] on which the *Heller* Court relied to circumscribe Second Amendment protection by reference to weapons "in common use at the time," which able-bodied men were expected to bring to their militias.[35] Quoting from the laws governing militias in Massachusetts, New York, and Virginia, *Miller* mentions "bayonet[s]"[36] and "sword[s]"[37]—military cutlery—but not knives. However, to reinforce its acknowledgment that "the Second Amendment does not protect those weapons not typically possessed by law-abiding citizens for lawful purposes, such as short-barreled shotguns,"[38] the Court in *Heller* also quoted from an opinion by the Supreme Court of Oregon: " 'In the colonial and revolutionary war era, [small arms] weapons used by militiamen and weapons used in defense of person and home were one and the same.' "[39] The Oregon court's opinion then elaborated in a passage not quoted in *Heller*: "A colonist usually had only one gun which was used for hunting, protection, and militia duty, plus a hatchet, sword, and knife."[40]

All this said, the discourse in *Heller* is focused exclusively on "arms" or "weapons," meaning firearms when read in context. Indeed, *Heller* acknowledged the handgun as "the quintessential self-defense weapon."[41] Furthermore, in citing the Oregon case, the Supreme Court only indirectly recognized the possible Second Amendment protection for knives in common use at the time; the Court did not elevate to *Heller's* text, and thus give express endorsement to, the list of colonial arms mentioned by the Oregon court and the secondary sources it cited.

Perhaps a detailed *Heller*-type analysis would result in a conclusion that some kinds of knives today—perhaps ordinary pocket knives or key chain knives, if not switchblades—are analogous to arms "typically possessed by law-abiding citizens for lawful purposes"[42] in colonial days, even though "not in existence at the time of the founding."[43] If so, such knives may qualify for Second Amendment protection. But if *Heller* "error" there be, we cannot find it "plain"—"clear" or "obvious"—that the *Heller* Court would extend its ruling to knives carried *exclusively* for use as a dangerous weapon in self-defense. Absent the kind of historical analysis the Court applied to guns, *Heller* does not give us the assurance necessary to find plain error

---

33. *Id.* at 2828.

34. *Supra* note 17.

35. *Heller, supra* note 11, 128 S.Ct. at 2815 (quoting *Miller, supra* note 17, 307 U.S. at 179, 59 S.Ct. 816).

36. *Supra* note 17, 307 U.S. at 181, 59 S.Ct. 816.

37. *Id.* at 180, 59 S.Ct. 816.

38. *Heller, supra* note 11, 128 S.Ct. at 2815–16.

39. *Id.* at 2815 (quoting *State v. Kessler*, 289 Or. 359, 614 P.2d 94, 98 (1980) (citing G. Neumann, Swords and Blades of the American Revolution, 6–15, 252–54 (1973))).

40. *Kessler, supra* note 39, 614 P.2d at 98 (citing Neumann, *supra* note 39). The Oregon court continued: "When the revolutionary war began, the colonists came equipped with their hunting muskets or rifles, hatchets, swords, and knives. The colonists suffered a severe shortage of firearms in the early years of the war, so many soldiers had to rely primarily on swords, hatchets, knives, and pikes (long staffs with a spear head)." *Id.* (citing W. Moore, Weapons of the American Revolution 8 (1967)).

41. *Heller, supra* note 11, 128 S.Ct. at 2818.

42. *Id.* at 2816.

43. *Id.* at 2792.

in the CDW instructions as applied to knives.[44]

## V.

But assume, nonetheless, solely for the sake of argument, that *Heller* would embrace the kind of knife that appellant allegedly can prove she carried for use exclusively in self-defense. That does not get her very far. In finding Second Amendment protection for possessing certain kinds of guns in the home for use in self-defense, the Supreme Court cautioned in *Heller* that it did "not read the Second Amendment to protect the right of citizens to carry arms for any sort of confrontation[.]"[45] In this case, appellant has acknowledged through counsel's briefs that she "carried the pocket knife in case of any future confrontation with Ms. Thomas," and that the instructions "required the jury to find that Ms. Wooden carried the knife *outside her home*."[46]

The facts are undisputed. Appellant Wooden was preparing for a confrontation anywhere, not just in defense of her home. Indeed, the fight did not occur anywhere near her home. Although appellant's husband lived in his grandmother's house in the District of Columbia where the fight began, appellant lived with her son and cousin in Hyattsville, Maryland. No one disputes that she carried the knife from Maryland to the grandmother's home in the District of Columbia. Moreover, the altercation began when appellant entered the front door of the grandmother's house; appellant was not there to defend against an intruder. In fact, appellant herself testified that it was only after the fight spilled onto the porch that she had "opened the blade" on her knife because she "wanted to scare Victoria [Thomas] to get her to stop hitting me." Clearly, this is not at all the home-defense scenario contemplated in *Heller*.[47]

Not long ago in *Sims v. United States*,[48] we rejected an argument for plain error under *Heller* when the appellant claimed Second Amendment protection by charging the facial invalidity of sundry weapons charges.[49] Appellant had been carrying, then discarded, a semi-automatic pistol in

44. *Supra* note 3.

45. *Heller, supra* note 11, 128 S.Ct. at 2799 (emphasis omitted).

46. (Appellant's opening brief at 28; appellant's reply brief at 5) (emphasis added). According to the fourth element of its instruction, *supra* note 3, the jury could not have convicted appellant of CDW without finding that she had "carried the deadly or dangerous weapon in a place *other than her home, place of business, or land or premises controlled by her.*" (Emphasis added.)

47. The government argues that "it is not plain that appellant carried the flip knife solely for purposes of self-defense"; rather, "the government's evidence established that appellant carried and used the knife in a confrontation that she initiated." As indicated, however, with reference to the "forbidden knife" and "concealment" issues, *see supra* notes 27 and

28, the "self-defense purpose" for which appellant carried the knife would be a question for a properly instructed jury; it cannot be decided on this record which, by hypothesis, did not reflect a trial governed by *Heller's* teaching, and where appellant was acquitted of assaulting Thomas with a knife. *Cf. Howerton v. United States*, 964 A.2d 1282, 1287 (D.C.2009) (trial court did not plainly err in entering judgments of conviction on weapons charges where jury found appellant used gun in his own home to commit assault with a dangerous weapon but where there was no evidence of possessing gun for purposes of self-defense).

48. 963 A.2d 147 (D.C.2008).

49. Carrying a pistol without a license, D.C.Code § 22–4504 (2001); possession of an unregistered firearm, D.C.Code § 7–2502.01 (2001); and unlawful possession of ammunition, D.C.Code § 7–2506.01 (2001).

an alley, away from his home. There was no evidence that he had been carrying the weapon for self-defense.[50] We affirmed his convictions because it was "not 'clear' and 'obvious'" that *Heller* "dictates an understanding of the Second Amendment which would compel the District to license a resident to carry and possess a handgun outside the confines of his home, however broadly defined."[51] We elaborated:

> In *Heller*, ... the issue presented was the constitutionality of the District's gun prohibitions as applied to "the possession of usable handguns *in the home*." 128 S.Ct. at 2787–88 (2008) (emphasis added). The Court concluded that "the District's ban on handgun possession *in the home* violates the Second Amendment, as does its prohibition [*see* D.C.Code § 7–2507.02] against rendering any lawful firearm *in the home* operable for the purpose of immediate self-defense"; and accordingly, it held that, "[a]ssuming ... Heller is not disqualified from the exercise of Second Amendment rights, the District must permit him to register his handgun and must issue him a license to carry it *in the home*." *Id.* at 2821–22 (emphasis added). Whatever else the Second Amendment might prohibit, the Court reiterated, it bars "the absolute prohibition of

handguns held and used for self-defense in the home." *Id.* at 2822.[52]

In applying *Heller*, therefore, the operative distinction for plain error purposes, as this Court has perceived it, is drawn between (1) possession of a qualifying weapon for purposes of self-defense in one's own home, which is entitled to Second Amendment protection, and (2) possession of such a weapon for self-defense or other uses outside one's home (or other uses in one's home).[53] Neither self-defense as such, nor even self-defense in the home of another (with a weapon carried there), is entitled to such protection, as we have read *Heller*. This division of the court is disinclined on plain error review to revisit a distinction the court has pronounced, especially when a weapon not addressed in *Heller*—a knife—is at issue.

## VI.

Wooden, however, offers a rebuttal. Counsel on appeal notes that unlike typical plain error review, where appellant's lawyer could have, but failed, to raise an issue at trial, this court's established case law precluded invocation of self-defense in contesting a CDW charge (absent evidence that the defendant had seized the weapon "on the spot for use in self-defense").[54]

---

50. The court noted that even if *Heller* could be read to protect use of a handgun in public for self-defense—"an issue on which we express no opinion"—no evidence supported appellant's self-defense theory. *Sims, supra* note 48, 963 A.2d at 150 n. 3. *See also Brown v. United States*, 979 A.2d 630, 642 (D.C.2009) (assuming Second Amendment protected appellant's right to carry pistol for self-defense in parking lot, conviction must be affirmed because of evidence that he carried pistol on another occasion with, admittedly, no reason for self-defense).

51. *Sims, supra* note 48, 963 A.2d at 150. *See Little v. United States*, 989 A.2d 1096, 1101

(D.C.2010) (trial court did not plainly err in finding no Second Amendment barrier to conviction on weapons offenses when defendant hit victim on head with gun in victim's apartment, not for purposes of self-defense "in his own home").

52. *Sims, supra* note 48, 963 A.2d at 150.

53. *See Little, supra* note 51, 989 A.2d at 1101; *Howerton, supra* note 47, 964 A.2d at 1287; *Sims, supra* note 48, 963 A.2d at 150.

54. *McBride, supra* note 9, 441 A.2d at 649 n. 9, 648 nn. 5 & 6, and 650.

Counsel therefore asks us to exercise our discretion under *Thomas v. United States*[55] to address claimed error under the Second Amendment. We decline to do so.

In *Thomas*, this court reviewed for plain error the trial court's failure to apply the confrontation-clause rule of *Crawford*,[56] which the Supreme Court announced after Thomas's trial. The government urged the court to answer the threshold "error" question because of the need for guidance in resolving "hundreds of drug cases prosecuted in Superior Court each year."[57] Exercising our discretion, we agreed to do so. Evaluating and applying all four *Olano*[58] factors, we found "error" that was "plain" and affected Thomas's "substantial rights," but we affirmed his conviction because the error did not " 'seriously affect[ ] the fairness, integrity, or public reputation of judicial proceedings.' "[59]

The question, therefore, is whether, as in *Thomas*, we should exercise our discretion to evaluate Second Amendment error, on the facts here, when we are satisfied that, whatever the answer, the error is not "plain at the time of appellate consideration," meaning that it is not "clear" or "obvious."[60] We say no. Beginning with the approach taken in *Thomas*, we can assume that there are other CDW cases, tried under the standard jury instruction before *Heller* was decided, for which a decision on appeal is not yet final; and thus we can further assume that a ruling on whether the Second Amendment can provide protection for claimed "self-defense (knife)," outside the home, would be helpful to litigants and the courts. Unlike *Thomas*, however, and the Supreme Court decision it addressed (*Crawford*), we do not have a situation in which the Court's understanding of constitutional law, as applied to a knife carried outside the home, can be discerned with sufficient certainty to warrant our venturing a decision on the alleged "error" in this case.

In the first place, *Crawford* announced a relatively straightforward rule that, as to testimonial evidence, a defendant was entitled to confront the witness in person, at trial, unless the witness was unavailable and the defendant had received an earlier opportunity to cross-examine that witness. In *Thomas*, that rule was easily applied to evidence supplied by a Drug Enforcement Administration chemist. To the contrary, in this case, it is not at all clear that *Heller* provides constitutional protection for carrying weapons outside the home, as occurred in this CDW prosecution.[61] Nor, more recently, in *McDonald v. City of Chicago*,[62] did the Court extend *Heller's* analysis to weapons carried outside the home.[63]

*Second,* one cannot say that the Supreme Court, whether in *Heller* or *Mc-*

**55.** 914 A.2d 1, 8 n. 7 (D.C.2006).

**56.** *Crawford v. Washington,* 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004).

**57.** *Thomas,* 914 A.2d at 8 n. 7.

**58.** *Olano, supra* note 5, 507 U.S. at 732, 113 S.Ct. 1770.

**59.** *Thomas,* 914 A.2d at 8, 22–24 (quoting *Olano, supra* note 5, 507 U.S. at 736, 113 S.Ct. 1770).

**60.** *Johnson, supra* note 21, 520 U.S. at 467–68, 117 S.Ct. 1544.

**61.** *See Little, supra* note 51, 989 A.2d at 1101; *Sims, supra* note 48, 963 A.2d at 150 & n. 4.

**62.** —— U.S. ——, 130 S.Ct. 3020, 177 L.Ed.2d 894 (2010).

**63.** *See id.* at 3026, 3050; *id* at 3088, 3103–04 (Stevens, J., dissenting).

*Donald*—both firearm cases—has considered application of the Second Amendment to knives (or weapons other than firearms). While there are a few references to knife-type weapons in both opinions,[64] they are included without analysis in quotations from secondary sources used by the authoring justices to address firearms. More importantly, in neither opinion has the Supreme Court supplied, for knives, the kind of historical analysis that went into developing the majority's conclusions about the right to bear firearms in *Heller* and *McDonald.* Nor have the briefs filed on behalf of Wooden given us a comprehensive analysis of "Second Amendment History: Knives" that could serve as a basis for our venturing into that area.

In sum, we have concluded that any error the trial court may have committed in giving the standard, pre-*Heller* instruction for CDW is not "plain," and thus that Wooden's conviction must be affirmed. Although in plain error review we have discretion, under *Thomas,* to resolve the threshold question of Second Amendment "error," we choose not to do so, as neither the Supreme Court nor Wooden herself has given us adequate grounds for reaching out to do so.

\*    \*    \*    \*    \*    \*

We need go no further. Given the distinctions from *Heller's* protective analysis we have presented above—the weapon (knife) and the confrontation outside (not inside) the home—we can find no "error"

that is "plain," within the meaning of plain error review. That ends the matter.

*Affirmed.*[65]

---

**64.** In addition to the references in *Heller* quoted above in Part IV, two similar references—to a "dirk" and a "bowie knife"—can be found in *McDonald. See* 130 S.Ct. at 3038; *see also id.* at 3120, 3132 (Breyer, J., dissenting).

**65.** On April 30, 2010, appellant filed a "conditional motion to postpone resolution of ap-

peal pending decision in a preserved case" raising the same issue. The government filed its opposition on May 18, followed by a reply by appellant filed May 21. This court granted appellant's motion on June 15 and stayed this appeal "pending further order of this court." By issuing this opinion, the court is vacating that stay.