Horry MACK, Appellant,

v.

UNITED STATES, Appellee.

No. 08–CF–603.

District of Columbia Court of Appeals.

Argued Oct. 13, 2010.

Decided Nov. 4, 2010.

Daniel I. Weiner, with whom Anjan Choudhury, David A. Handzo, and J. Alex Ward, Washington, DC, were on the brief, for appellant.

Patricia A. Heffernan, Assistant United States Attorney, with whom Ronald C.

Machen Jr., United States Attorney, and Roy W. McLeese III, Assistant United States Attorney were on the brief, for appellee.

Before GLICKMAN and FISHER, Associate Judges, and PRYOR, Senior Judge.

FISHER, Associate Judge:

On November 30, 2006, appellant Horry Mack stabbed Joseph David Price with an ice pick, inflicting injuries from which Price later died. Appellant claimed at trial that he acted in self-defense, and the jury acquitted him of second degree murder while armed, manslaughter while armed, and possession of a dangerous weapon with intent to use it unlawfully against another (PPW (b)).[1] He now challenges his conviction for carrying a dangerous weapon (CDW),[2] asserting that the jury instructions misconstrued the statute and that convicting him of CDW under these circumstances violated his Second Amendment rights. We disagree, and affirm.

## I. The Factual and Procedural Background

Viewed in a light most favorable to appellant,[3] the evidence showed the following. On November 30, 2006, appellant Mack was walking home from the neighborhood grocery store after purchasing some styrofoam plates for his godmother. Mr. Price, whom appellant Mack had seen before but did not know, began to follow Mr. Mack, saying, "Somebody gonna give me something, I'm gonna fuck you up."

Mr. Price jumped in front of Mr. Mack, blocking the alley that led to Mr. Mack's house, and began to assault him. Although Mr. Mack testified about Mr. Price's aggressive behavior, he never suggested that he saw Mr. Price with a weapon. Mr. Mack managed to break free and went through the alley and into his house. Encountering Curtis McClean, one of his house mates, inside, Mr. Mack mentioned that he had "had a scrap." When McClean inquired why appellant did not ask for help, appellant responded, "I have it under control."

A few minutes after Mr. Mack arrived home, his godmother told him that he had purchased the wrong items and instructed him to go back to the store to replace them. Mr. Mack explained, "I picked up an ice pick out of the drawer on my way out.... And once I got to the back door and opened it, kind of like looked out, I slid it in my pocket ... [h]andle down." "I picked it up just in that he may have somebody out there, it may be more than one person; I was afraid."

Mr. Mack exited back into the alley and soon was approached by Mr. Price, who resumed his assaultive behavior. Mr. Mack attempted to get away, but he saw Mr. Price step back and move his hands around the area of his pockets. Fearing that Mr. Price had a weapon, Mr. Mack grabbed the ice pick and stabbed him in the heart. Mr. Mack never claimed to have actually seen Mr. Price with a weapon, and police never found one. Mr. Price

---

1. D.C.Code §§ 22–2103, –4502 (2001); D.C.Code §§ 22–2105, –4502 (2001); D.C.Code § 22–4514(b) (2001).

2. D.C.Code § 22–4504(a) (2001).

3. *See Muschette v. United States,* 936 A.2d 791, 798 (D.C.2007) ("In reviewing claims of instructional error, we view the evidence in the light most favorable to the defendant in order to ascertain whether there 'exist[ed] evidence sufficient for a reasonable jury to find in his favor.'") (quoting *Bonilla v. United States,* 894 A.2d 412, 417 (D.C.2006)).

fell into a coma, and he died on March 4, 2007.

At trial, defense counsel proposed an addition to the jury instruction on the charge of carrying a dangerous weapon (CDW). The proffered supplement read, in pertinent part:

> When a person carries an item that can be used as a deadly or dangerous weapon [such as a knife or ice pick], but uses that item only during the exercise of actual self-defense, that person is not guilty of the offense of carrying a deadly or dangerous weapon.

After extended discussion, the trial court declined to add this language to its jury instructions.

The court read the standard Redbook instructions for the offense of CDW,[4] which told the jury that the government was required to prove "that the defendant intended to use the object as a dangerous weapon.... Some objects may be used as tools or for other useful purposes. The law does not prohibit carrying those objects for those purposes. Therefore, the Government must prove that the defendant intended to use the object as a dangerous weapon."

The court also explained how the law of self-defense applied to the CDW charge.[5] "When a person picks up and uses a dangerous ... weapon during the actual exercise of self-defense ..., that person is not guilty of carrying a dangerous weapon ... during the period of actual self-defense." "On the other hand, if a person unlawfully carries ... a dangerous ... weapon and then at a later time [ ] uses the weapon in actual self-defense, then that later lawful use does not by itself make the earlier carrying or possession of the weapon [ ]lawful." The jury found Mr. Mack

guilty of CDW. He now asserts that the trial court committed reversible error when it refused to include the proposed supplemental instruction.

## II. Construing the Statute

### A. Appellant Presents an Issue of Law

■ "The primary and general rule of statutory construction is that the intent of the lawmaker is to be found in the language that he has used." *Peoples Drug Stores, Inc. v. District of Columbia,* 470 A.2d 751, 753 (D.C.1983) (en banc) (internal quotation marks and citation omitted). D.C.Code § 22–4504(a) (2001), the statute on which we focus here, provides that "[n]o person shall carry within the District of Columbia either openly or concealed on or about their person, a pistol, without a license issued pursuant to District of Columbia law, or any deadly or dangerous weapon capable of being so concealed."

As framed by appellant, the issue in this case "is whether carrying an inherently lawful object for the lawful purpose of self-defense is prohibited by D.C.Code § 22–4504(a)." We think it would be more accurate to ask "whether the statute permitted appellant to carry a deadly or dangerous weapon, capable of being concealed on or about his person, in anticipation of a future need to use it in self-defense." However phrased, the question presented is one of law, which we review *de novo. See Appleton v. United States,* 983 A.2d 970, 977 (D.C.2009) ("Where the question of whether a jury instruction was proper is a legal question, ... we review the instruction *de novo.*") (citing *Wilson–Bey v. United States,* 903 A.2d 818, 827 (D.C.2006) (en banc)); *Holloway v. United States,* 951 A.2d 59, 60 (D.C.2008) ("As this appeal

---

4. Criminal Jury Instructions for the District of Columbia, No. 4.70 (4th ed. rev. 2008).

5. Criminal Jury Instructions for the District of Columbia, No. 4.71 (4th ed. rev. 2008).

raises a question of statutory interpretation, our review is *de novo*.").

■ " 'As a general proposition a defendant is entitled to an instruction as to any *recognized* defense for which there exists evidence sufficient for a reasonable jury to find in his favor.' " *Minor v. United States,* 623 A.2d 1182, 1184–85 (D.C. 1993) (quoting *Mathews v. United States,* 485 U.S. 58, 63, 108 S.Ct. 883, 99 L.Ed.2d 54 (1988)) (emphasis added). However, " '[a] requested instruction is not appropriate if, as a matter of law, the defendant would not be entitled to the defense.' " *Jones v. United States,* 999 A.2d 917, 922 (D.C.2010) (quoting *Barnhardt v. United States,* 954 A.2d 973, 976 (D.C.2008)).

■ It is well-established that the CDW statute applies not only to "inherently dangerous" objects, but also to ordinary items which are "likely to produce death or great bodily injury by the use made of [them]." *Wright v. United States,* 926 A.2d 1151, 1154–55 (D.C.2007) (quoting *Scott v. United States,* 243 A.2d 54, 56 (D.C.1968)). When the object "has some useful natural purpose (other than to inflict injury)," *Wright,* 926 A.2d at 1155, the government must prove that the defendant's "purpose in carrying [the] object was its use as a deadly or dangerous weapon.…" *Monroe v. United States,* 598 A.2d 439, 441 (D.C.1991) (quoting *In re S.P.,* 465 A.2d 823, 826 (D.C.1983)). However, "[p]roof of an intent to use [the weapon] for an unlawful purpose is not an element of the offense." *Scott,* 243 A.2d at 56 (citing *United States v. Shannon,* 144 A.2d 267 (D.C.1958)).

■ Here there is no doubt—indeed, Mr. Mack does not dispute—that he carried the ice pick for use as a weapon. Nevertheless, appellant asks us to recognize a right to carry a dangerous weapon on the streets of the District of Columbia as a precautionary measure, in anticipation of the need to use it in self-defense. We have never recognized such a sweeping exemption from the statute's prohibition.[6] Indeed, doing so now would be inconsistent with prior, binding authority. *See M.A.P. v. Ryan,* 285 A.2d 310, 312 (D.C. 1971). We therefore conclude that the trial court did not err in denying the proposed instruction.

**B.** ***Wilson, Dandridge,*** **and** ***Cooke***

■ Although the CDW statute announces a flat prohibition on carrying a pistol without a license and on carrying deadly or dangerous weapons that are capable of being concealed on or about one's person, this jurisdiction has long recognized "that one is not guilty of carrying an unlicensed gun during the period it is actually used in self-defense.…" *Cooke v. United States,* 107 U.S.App. D.C. 223, 224, 275 F.2d 887, 888 (1960); *see also Wilson v. United States,* 91 U.S.App. D.C. 135, 136, 198 F.2d 299, 300 (1952) ("The exigencies of the occasion justified Wilson in obtaining a weapon and using it in his self-defense.…"). However, "this doctrine is inapplicable where one anticipating harm carries a pistol in public for a period of time before the actual danger arises." *Hurt v. United States,* 337 A.2d 215, 217 (D.C.1975) (describing the circuit court's holding in *Cooke* ); *see also Dandridge v.*

---

**6.** Mr. Mack bases his argument in large part on Judge Schwelb's dissent in *Monroe v. United States,* 598 A.2d 439 (D.C.1991), questioning whether "Congress intended to criminalize the possession of an intrinsically lawful object solely because of the possessor's hypothetical future interest to use that object law-

fully as a weapon, which future intent would only come into play in the event of an unlawful assault by another." *Id.* at 442. As Mr. Mack correctly notes, however, the majority opinion in *Monroe* did not address this issue. *Id.* at 442 n. 10, 443 n. 2. We will later have more to say about the dissent in *Monroe.*

*United States,* 105 U.S.App. D.C. 157, 265 F.2d 349 (1959); *Wilson v. United States,* 91 U.S.App. D.C. at 136, 198 F.2d at 300 (recognizing that Wilson could lawfully be convicted of carrying a pistol without a license if the weapon was "on or about his person" before the disorderly group attacked him).

*Dandridge* presented a scenario quite similar to the one before us now. There, the defendant had been convicted of carrying a dangerous weapon but he was acquitted of committing an assault with the same weapon. On appeal, Dandridge asserted that the trial court erred in refusing his request for an instruction "in accordance with the doctrine of *Wilson v. United States.*" 105 U.S.App. D.C. at 158, 265 F.2d at 350. He argued that "he had a right to have the gun in his possession, because he had had difficulty with the complaining witness whom he shot and the shooting actually occurred in Dandridge's home." *Id.*

Rejecting these arguments, the D.C. Circuit affirmed his conviction, explaining that "the doctrine of the *Wilson* case was not applicable...." *Id.* "Dandridge, after his [initial] difficulty with complainant Allen, took his pistol from under his mattress in his home, put it in his waistband, and went across the street, where he sat on a neighbor's steps for over an hour. Thus, clearly, he was guilty of carrying a dangerous weapon during this interval of time, and on the public street." *Id.* In other words, Dandridge's later actions in self-defense did not justify his previous carrying of a dangerous weapon.

The circuit court reached a similar conclusion in *Cooke,* where the jury had acquitted the defendant of assault with a dangerous weapon, but "found him guilty on the companion charge of carrying the pistol which he used to defend himself." 107 U.S.App. D.C. at 223, 275 F.2d at 887.

Mr. Cooke's "primary point on ... appeal [was] that the court erred in refusing to instruct the jury that he could lawfully carry the gun in order to defend himself from a reasonably entertained fear of imminent bodily harm." *Id.* at 223–24, 275 F.2d at 887–88. The court acknowledged that Cooke had reason to be apprehensive. He and Royster "had engaged in several heated encounters in the year prior to the shooting"; on the day of the offense, Cooke had gone so far as to request police protection; and before leaving his shop, Cooke "put a gun in his pocket because he was afraid of Royster." *Id.* "Within a few minutes, Royster was upon him and [Cooke] shot him in the leg." *Id.* Nevertheless, concluding that the facts of the case were more analogous to *Dandridge* than to *Wilson, id.,* the court held "that the trial court properly refused the requested instruction." *Id.* at 224, 275 F.2d at 889.

As the holdings in *Dandridge* and *Cooke* make clear, *Wilson* recognized a very limited defense to the charge of carrying a dangerous weapon—one strictly based on self-defense. But " 'the law of self-defense is a law of necessity; the right of self-defense arises only when the necessity begins, and equally ends with the necessity.' " *Rorie v. United States,* 882 A.2d 763, 771 (D.C.2005) (quoting *United States v. Peterson,* 157 U.S.App. D.C. 219, 226, 483 F.2d 1222, 1229 (1973) (internal quotation marks and additional citation omitted)). "In order to invoke a legitimate claim of self-defense, a defendant must satisfy the following conditions: (1) there was an actual or apparent threat; (2) the threat was unlawful and immediate; (3) the defendant honestly and reasonably believed that he was in imminent danger of death or serious bodily harm; and (4) the defendant's response was necessary to save himself from the danger." *Brown v.*

*United States,* 619 A.2d 1180, 1182 (D.C. 1992).[7] It cannot candidly be said that these criteria had been satisfied when appellant Mack slid the ice pick into his pocket and stepped out of his house into the alley. Thus, like Messrs. Wilson, Cooke, and Dandridge, appellant Mack had no right to carry a dangerous weapon on the streets of the District of Columbia, anticipating that he might need it for self-defense.

### C. Good Intentions

 Unable to satisfy the requirements of self-defense during the period before Price renewed his assault, appellant posits that "carrying an inherently lawful object for the lawful purpose of self-defense is [not] prohibited by D.C.Code § 22–4504(a)." The principal problem with Mr. Mack's argument is presented by the plain language of the statute. Carrying a dangerous weapon is a general intent crime—it requires "no proof of unlawful intent." *See United States v. Shannon,* 144 A.2d 267, 269 (D.C.1958); *see also McBride v. United States,* 441 A.2d 644, 649 n. 7 (D.C.1982) (describing carrying a concealed weapon as a " 'general intent' weapons offense" and contrasting it with the specific intent crime of possession of a prohibited weapon, which "provides the basis for a broader defense than the defenses available for general intent weapons offenses"). As we have previously explained, "[a] person who possesses a 'dangerous weapon' in good faith anticipation of a need to use it in self-defense may be guilty of a general intent weapons of-

fense." *McBride,* 441 A.2d at 649 n. 9. *Accord, United States v. Vinton,* 389 U.S.App. D.C. 199, 208, 594 F.3d 14, 23 (2010) ("That he may have planned to use the knife only in self-defense or defense of another is irrelevant, so long as he intended to use it as a weapon.").

### D. Pistols Versus Ice Picks

Mr. Mack attempts to avoid the force of prior decisions by pointing out that the *Wilson–Dandridge–Cooke–Hurt* line of cases "involved the use of a gun," whereas he carried an ice pick. We simply are not persuaded that this factual difference should exempt him from the plain language of the statute, or from our well-established precedent. Although the statute permits a person to carry a pistol when he is licensed to do so, it otherwise forbids the carrying of "*any deadly or dangerous weapon*" that is capable of being concealed on or about the person. D.C.Code § 22–4504(a) (2001) (emphasis added). No matter what form the deadly or dangerous weapon takes, there are ample reasons to permit a claim of self-defense only in cases of true necessity.

 As numerous cases in this jurisdiction illustrate, items normally employed as tools easily may be used as dangerous or even lethal weapons. *See, e.g., Diggs v. United States,* 966 A.2d 857, 860 (D.C. 2009) ("There is no question that a hammer can have many useful and legitimate purposes.... Likewise, however, there can be no doubt that a hammer can be extremely dangerous, even an instrument of death...."); *Jones v. United States,*

**7.** Moreover, "[a] defendant cannot successfully claim self-defense when he left an apparently safe haven to arm himself and return to the scene." *Brown v. United States,* 619 A.2d 1180, 1182 (D.C.1992) (internal quotation marks and citation omitted). " 'If one has reason to believe that he will be attacked, in a manner which threatens him with bodily injury, he must avoid the attack if it is possible to do so, and the right of self-defense does not arise until he has done everything in his power to prevent its necessity.' " *Sams v. United States,* 721 A.2d 945, 953 (D.C.1998) (quoting *Laney v. United States,* 54 App. D.C. 56, 58, 294 F. 412, 414 (1923)).

401 A.2d 473, 476 (D.C.1979) ("[like a] utility knife[,] . . . [a] furniture leg may also be a dangerous weapon"); *Best v. United States,* 237 A.2d 825, 826 (D.C. 1968) ("There is no doubt that under certain circumstances a hawk-bill knife can be a dangerous weapon."). Indeed, there are legions of cases in the District of Columbia where tools such as box cutters, knives, screwdrivers, or ice picks have been used to kill or to inflict severe injury. *See Jones v. United States,* 999 A.2d 917 (D.C. 2010) (victim died after being stabbed with box cutter); *Johnson v. United States,* 960 A.2d 281 (D.C.2008) (victim died from wounds inflicted with knives, a screwdriver, a floor buffer, and a hacksaw); *Braxton v. United States,* 395 A.2d 759 (D.C. 1978) (victim died as a result of wounds inflicted with a knife and screwdriver); *Gaither v. United States,* 391 A.2d 1364 (D.C.1978) (victim stabbed to death with an ice pick).

These and many other cases vividly demonstrate the problem with allowing an exception to the CDW statute for anticipatory self-defense. When dangerous weapons are readily available, death or serious injury too often result. One who carries a knife, a pistol, or an ice pick may think that he will use it only in lawful self-defense. But threats, violence, and other unsettling events may occur without warning. People who are startled or upset may overreact, lose their tempers, or make poor judgments under stress. Even when they start out with good intentions, persons who carry items capable of inflicting death or great bodily injury may use them in ways and in situations that are not justified—with grave results.

Accusing the government of "an alarming serious lack of sensitivity to the plight of vulnerable District residents who live in high crime neighborhoods," appellant asserts that "the responsibility to avoid the use of deadly force does not extend to remaining a voluntary prisoner in one's own home." This rhetorical flourish wrongly assumes that the only truly empathetic response is to allow law-abiding citizens to arm themselves before venturing outside. Anyone familiar with the annals of violent crime in this city might well be more alarmed by the prospect of a proliferation of dangerous weapons on the streets of the Nation's Capital. That more compelling public policy concern underlies the legislature's choice.

In *Shannon,* this court traced the evolution of the CDW statute from 1932, when Congress replaced "[a] much older dangerous weapon statute" that required "proof of intent of unlawful use" with the general intent crime that we have today. 144 A.2d at 267–69. Subsequent amendments followed, with no change to the intent element of the crime. *Id.* at 268. In 1953, Congress enacted a new statute (known colloquially as "PPW(b)") prohibiting the possession of a dangerous weapon "with intent to use [it] unlawfully against another." [8]

If, as Mr. Mack suggests, the goal of the 1953 legislation had been to allow persons to carry weapons for purposes of self-defense, there would have been no reason to retain the CDW statute after the offense of PPW(b) was created. However, "[i]n a series of hearings and reports by Senate and House Committees it was made clear that the purpose of the new legislation was to strengthen rather than supplant existing law, and to provide 'tighter controls over the possession of dangerous weapons.'" *Id.* (citations omitted); *see also Cooke,* 107 U.S.App. D.C. at 225, 275 F.2d at 889 ("[I]n light of the history of anti-weapons legislation evidenc-

---

8. D.C.Code § 22–4514(b) (2001).

ing the clearest intent to drastically tighten the ban on carrying dangerous weapons, we cannot assume that Congress was unaware of th[e] ... possibility that an exercise of the common law right of self-defense ... might involve a violation [of the statute].""). Thus, the fact that the CDW and PPW(b) statutes coexist and have "distinctive objects of correction," *Shannon,* 144 A.2d at 268, refutes Mr. Mack's argument that it is not an offense to carry a dangerous weapon if one intends only to use it in self-defense.[9]

### E. The Dissent in *Monroe*

Appellant misplaces his reliance upon *the dissent* in *Monroe v. United States,* 598 A.2d 439 (D.C.1991). Mr. Monroe approached the security station at the Longworth House Office Building and asked to leave his briefcase there because it could not pass through the x-ray equipment. He explained, "I have weapons in my bag." An inspection revealed a 10 inch K–Bar knife. He commented that he was seeking work as a bodyguard and that "I use [the knife] to defend myself" and "for protection." The majority upheld his conviction, "see[ing] no basis for acquittal based on insufficient proof of a present intent" to use the knife as a dangerous weapon. 598 A.2d at 441–42.

Judge Schwelb dissented, finding "it ... difficult to believe that Congress intended to criminalize the possession of an intrinsically lawful object solely because of the possessor's hypothetical future intent to use that object lawfully as a weapon, which future intent would only come into play in the event of an unlawful assault by another." *Monroe,* 598 A.2d at 442. Judge Schwelb did not think the court "should

read a statute as proscribing ... the act of carrying a lawful object with a hypothetical but lawful future intent unless the legislature has plainly and unambiguously made such activity criminal." *Id.* at 442. We think that test is met here. For the reasons discussed above, we conclude that the legislature intended to prohibit the conduct for which Mr. Mack was convicted.

### F. The Rule of Lenity and the Canon of Constitutional Avoidance

Mr. Mack also invokes the rule of lenity and the doctrine of constitutional avoidance to support his reading of the CDW statute. Without conflating these independent canons of statutory construction, we note that both share one important characteristic: they may properly be invoked only in limited circumstances. For the rule of lenity to apply, there must be true ambiguity in a criminal statute: the "statute's language, structure, purpose and legislative history [must] leave its meaning genuinely in doubt." *United States Parole Comm'n v. Noble,* 693 A.2d 1084, 1104 (D.C.1997) (citations omitted), *reinstated as the opinion of the en banc court,* 711 A.2d 85, 86 (D.C.1998) (en banc). "[A]s is true of any guide to statutory construction, [the rule of lenity] only serves as an aid for resolving an ambiguity; it is not to be used to beget one." *Callanan v. United States,* 364 U.S. 587, 596, 81 S.Ct. 321, 5 L.Ed.2d 312 (1961) (footnote omitted).

Similarly, the canon of constitutional avoidance "is an interpretive tool, counseling that ambiguous statutory language be construed to avoid serious constitutional doubts." *FCC v. Fox Televi-*

---

9. It is not uncommon for similar conduct to be proscribed by two or more statutes, and this court has held that in certain situations "prosecution may properly be brought under either" the CDW or the PPW statute. *See Degree v. United States,* 144 A.2d 547, 550 (D.C.1958); *see also United States v. Young,* 376 A.2d 809, 812 (D.C.1977) ("[T]here is no constitutional infirmity in the coexistence of two statutes prohibiting the same conduct.").

*sion Stations, Inc.,* — U.S. ——, 129 S.Ct. 1800, 1811, 173 L.Ed.2d 738 (2009); *see also Salinas v. United States,* 522 U.S. 52, 60, 118 S.Ct. 469, 139 L.Ed.2d 352 (1997) (rejecting invocation of the avoidance canon because the text of the statute in question was "unambiguous on the point under consideration"). It is intended as "a means of giving effect to congressional intent, not of subverting it." *Clark v. Martinez,* 543 U.S. 371, 382, 125 S.Ct. 716, 160 L.Ed.2d 734 (2005); *see also United States v. Raynor,* 302 U.S. 540, 552, 58 S.Ct. 353, 82 L.Ed. 413 (1938) ("No rule of construction, [ ] requires that a penal statute be strained or distorted in order to exclude conduct clearly intended to be within its scope...."). Resort to the avoidance doctrine is appropriate only when one plausible interpretation of a statute would provoke a confrontation with the Constitution. *See In re Johnson,* 699 A.2d 362, 369 (D.C.1997) ("Where ... the statutory language permits, we construe a statute so as to avoid a constitutional confrontation."); *Gay Rights Coalition of Georgetown Univ. Law Center v. Georgetown Univ.,* 536 A.2d 1, 16 (D.C.1987) (en banc) (plurality opinion) ("We do not needlessly pit a statute against the Constitution.").

Neither the rule of lenity nor the doctrine of constitutional avoidance is appropriately applied to Mr. Mack's case. As our discussion demonstrates, the reach and meaning of the CDW statute are well-established by its plain language and our precedent—there is no ambiguity here. Moreover, we do not face an imminent confrontation between the CDW statute and the Constitution. As we explain below, it is by no means clear that the Second Amendment even applies in these circumstances.

## III. The Second Amendment Claim

Appellant Mack also claims that convicting him of CDW under these circumstances violated his Second Amendment rights.[10] *See generally District of Columbia v. Heller,* — U.S. ——, 128 S.Ct. 2783, 171 L.Ed.2d 637 (2008). Because Mr. Mack failed to preserve this issue in the trial court, we review only for plain error. Applying that standard, we recently rejected a similar claim in *Wooden v. United States,* 6 A.3d 833 (D.C.2010), finding no error that was "plain" when a defendant was convicted of CDW after carrying a knife outside her home and then using it in self-defense. For similar reasons, we find no plain error here.

▆▆▆▆ Mr. Mack did not mention the Second Amendment in the trial court, and his reliance on the common law doctrine of self-defense was not sufficient to raise a constitutional claim.[11] *See Hunter v. United States,* 606 A.2d 139, 144 (D.C.1992) ("Objections must be made with reasonable specificity [in order for] the judge [to be] fairly apprised as to the question on which he is being asked to rule."). Likewise, Mr. Mack's mention of a different constitutional provision—the due process clause—in a post-trial motion for judgment of acquittal did not fairly raise a Second

---

**10.** The Second Amendment provides: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed."

**11.** Mr. Mack points to defense counsel's discussion with the trial court regarding the proposed addition to the jury instructions on CDW to show that counsel raised the issue of whether the "inherent right of self-defense" applied in the circumstances of Mr. Mack's case. There was, however, no mention of the Constitution at any point throughout this discussion, nor do we see how the trial court could fairly be charged with equating the words "self-defense" with a Second Amendment challenge to the statute.

Amendment claim. Furthermore, his due process argument came too late to preserve an objection to the jury instructions. *See Smith v. United States,* 847 A.2d 1159, 1160 (D.C.2004) (applying plain error review to issue that was first mentioned to the trial court several weeks after trial); *United States v. Thompson,* 307 U.S.App. D.C. 221, 223, 27 F.3d 671, 673 (1994) ("For purposes of determining our standard of review of an alleged error in admission of evidence, [ ] a post-verdict motion for a new trial is not the same as a timely objection.").

▮▮▮▮▮ Under the familiar test for plain error, "the appellant must show that the objectionable action was (1) error, (2) that is plain, (3) that affects substantial rights, and (4) that seriously affects the fairness, integrity, or public reputation of judicial proceedings." *Marquez v. United States,* 903 A.2d 815, 817 (D.C.2006) (citing *United States v. Olano,* 507 U.S. 725, 732–36, 113 S.Ct. 1770, 123 L.Ed.2d 508 (1993)); *see also In re D.B.,* 947 A.2d 443, 450 (D.C.2008) (citation omitted). An error is "plain" if it is "clear" or "obvious." *Olano,* 507 U.S. at 732, 113 S.Ct. 1770. In circumstances such as these, " 'where the law at the time of trial was settled and clearly contrary to the law at the time of appeal— it is enough that the error be 'plain' at the time of appellate consideration.' " *Thomas v. United States,* 914 A.2d 1, 20 (D.C.2006) (quoting *Johnson v. United States,* 520 U.S. 461, 468, 117 S.Ct. 1544, 137 L.Ed.2d 718 (1997)).

▮▮▮ Mr. Mack has not established that his conviction represents a "clear" or "obvious" violation of his Second Amendment rights, even in light of *Heller* and the more recent decision in *McDonald v. City of Chicago,* —— U.S. ——, 130 S.Ct. 3020, 177 L.Ed.2d 894 (2010). In *Heller,* the Supreme Court held that the Second Amendment does not permit "the absolute prohibition of handguns held and used for self-defense in the home." 128 S.Ct. at 2822. At the same time, the Court recognized that, "[l]ike most rights, the right secured by the Second Amendment is not unlimited." *Id.* at 2816. In the two years since *Heller* was decided, neither the Supreme Court nor this court has defined the precise limits of that right, leaving open substantial questions as to how far *Heller's* analysis properly extends.[12] As a result, it is neither "clear" nor "obvious" that the Second Amendment applies to the situation presented in this appeal.

As a preliminary matter, it is not at all clear that the Second Amendment right to keep and bear arms applies to the ice pick carried by Mr. Mack. *Heller* made clear that "the Second Amendment right, whatever its nature, extends only to certain types of weapons." 128 S.Ct. at 2814. Thus, although this right extends, "prima facie, to all instruments that constitute bearable arms, even those that were not in existence at the time of the founding[,]" *id.* at 2792, "the Second Amendment's operative clause furthers the purpose announced in its preface." *Id.* at 2815. "The traditional militia was formed from a pool of men bringing arms 'in common use at the time' for lawful purposes like self-defense." *Id.; see also Wooden,* 6 A.3d at 838–39. With no convincing historical analysis demonstrating their suitability for use in the militia, we cannot say it is "clear" or "obvious" that the Second Amendment secures

---

**12.** The Court in *Heller* acknowledged that it was leaving "many applications of the right to keep and bear arms in doubt," explaining that "since this case represents this Court's first in-depth examination of the Second Amendment, one should not expect it to clarify the entire field." *District of Columbia v. Heller,* —— U.S. ——, 128 S.Ct. 2783, 2821, 171 L.Ed.2d 637 (2008).

the right of the people "to keep and bear" ice picks.

Even assuming that ice picks fall within the purview of the Second Amendment, it is still neither clear nor obvious that Mr. Mack had a constitutional right to carry his ice pick in the circumstances of this case. He was charged with a felony violation of "Carrying a Dangerous Weapon (Outside Home or Place of Business)," [13] and the indictment specifically alleged that he carried the weapon "in a place other than his dwelling place, place of business or on other land possessed by him." Moreover, the jurors were instructed that, in order to convict Mr. Mack, they would have to find that he "carried the dangerous weapon in a place other than his home, place of business, or land or premises possessed and controlled by him." Thus, like *Wooden*, this case does not present the question of whether the statute may be constitutionally applied to the possession or carrying of dangerous weapons inside the home.

The Supreme Court has stated broadly that "the inherent right of self-defense has been central to the Second Amendment right." *Heller*, 128 S.Ct. at 2817. But, as we noted in *Wooden*, *Heller* did not endorse a right to carry weapons *outside* the home. Nor has the Court done so in its more recent decision in *McDonald*. As a result, we simply cannot find any error that is "plain" in failing to extend *Heller* to a case such as this one, where a weapon is carried outside the home. *See Sims v. United States*, 963 A.2d 147, 150 (D.C. 2008) ("[W]hat assuredly is not 'clear' or 'obvious' from [*Heller*] is that it dictates an understanding of the Second Amend-

ment which would compel the District to license a resident to carry and possess a handgun outside the confines of his home, however broadly defined[.]"); *see also Little v. United States*, 989 A.2d 1096, 1101 (D.C.2010) (rejecting, on plain error review, a Second Amendment challenge to weapons offense convictions because "appellant was outside the bounds of *Heller*, *i.e.*, the possession of a firearm in one's own home for self-defense purposes").

Another equally damaging defect in Mr. Mack's argument is that *Heller* did not recognize a right to carry concealed weapons. By Mr. Mack's own admission, he left the house and encountered Mr. Price while carrying the ice pick in his pocket. In *Heller* the Supreme Court made clear that "the right secured by the Second Amendment is not unlimited," and it specifically acknowledged that laws prohibiting the carrying of concealed weapons have long been upheld as appropriate limits on that right. 128 S.Ct. at 2816 ("[T]he majority of 19th century courts to consider the question held that prohibitions on carrying concealed weapons were lawful."). *See Robertson v. Baldwin*, 165 U.S. 275, 281–82, 17 S.Ct. 326, 41 L.Ed. 715 (1897) ("[T]he right of the people to keep and bear arms ... is not infringed by laws prohibiting the carrying of concealed weapons ...." (dictum)). In short, it simply is not obvious that the Second Amendment secures a right to carry a concealed weapon.

It thus is neither "clear" nor "obvious" that convicting appellant of CDW under these circumstances violates his Second Amendment rights, and we are disin-

---

**13.** D.C.Code § 22–4504(a) ("No person shall carry within the District of Columbia either openly or concealed on or about their person ... any deadly or dangerous weapon capable of being so concealed."); D.C.Code § 22–4504(a)(1) ("A person who violates this sec-

tion by carrying ... any deadly or dangerous weapon, in a place other than the person's dwelling place, place of business, or on other land possessed by the person, shall be fined not more than $5,000 or imprisoned for not more than 5 years, or both[.]").

clined—as we were in *Wooden*—to delve further into these questions when our review is limited by the plain error standard.

## IV. Conclusion

The judgment of the Superior Court is hereby

*Affirmed.*