*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

# DISTRICT OF COLUMBIA COURT OF APPEALS

No. 19-CF-0511

SAEVE EDWARD EVANS, APPELLANT,

V.

UNITED STATES, APPELLEE.

Appeal from the Superior Court
of the District of Columbia
(2016-CF1-020268)

(Hon. Craig Iscoe, Trial Judge)

(Argued May 24, 2022                                    Decided November 16, 2023)

*Kelsey Townsend*, Public Defender Service, with whom *Samia Fam* and *Mikel-Meredith Weidman,* Public Defender Service, were on the brief, for appellant.

*Timothy R. Cahill*, Assistant United States Attorney, with whom *Channing D. Phillips,* Acting United States Attorney at the time, and *Chrisellen R. Kolb*, *Elizabeth H. Danello*, *Lindsay Merikas*, *Shehzad Akhtar*, and *Elizabeth Gabriel*, Assistant United States Attorneys, were on the brief, for appellee.

Before DEAHL and ALIKHAN, *Associate Judges*, and GLICKMAN,[*] *Senior Judge*.

Opinion for the court by *Associate Judge* DEAHL.

Dissenting opinion by *Associate Judge* ALIKHAN at page 46.

---

[*] Judge Glickman was an Associate Judge at the time of argument.

DEAHL, *Associate Judge*: The otherwise illegal possession of a firearm may be justified, so as not to be criminal, if the weapon is held in lawful self-defense. This case presents the question of when precisely that legal justification ends— whether it is the instant a person realizes the threat has subsided or if it instead extends to a period allowing the person to reasonably relinquish the weapon. The trial court instructed the jury, as the government now maintains, that the justification ends the moment the person appreciates that the threat animating the right to self-defense has subsided, so that they must effectively drop the gun in that instant or otherwise lose their justification defense. In appealing his conviction for unlawful possession of a firearm, Saeve Evans counters that the justification defense logically extends to a short period after the person realizes the threat has subsided, so that they have a reasonable opportunity to promptly dispossess themselves of the weapon. We agree with Evans and reverse his conviction for unlawful possession of a firearm.

This case presents an unusual set of facts that give rise to the issue of first impression before us. Evans was standing in an apartment complex parking lot when a car with counterfeit tags drove up to him with its windows down. Surveillance footage showed Evans firing a gun at the car, though Evans claimed—and there was considerable evidence to support—that he acted in self-defense after the car's occupants shot at him first (Evans's friend was killed in the crossfire). The jury credited that defense when it acquitted Evans of first-degree murder and several

related charges, but it evinced some confusion about how Evans's self-defense claim intersected with one charge: unlawful possession of a firearm. There was virtually no evidence about how Evans came into possession of the firearm, or what he did with it after the shooting, beyond a video showing that he held it for about three seconds as he ran from the scene after fending off his attackers.

During its deliberations, the jury—apparently unconvinced that Evans's initial procurement of the gun was unlawful—asked "[h]ow long after" the time of "actual self-defense" the justification for possessing a firearm extends, querying whether it includes a "reasonable period of time to ensure that the danger has passed" or "some other standard?" Evans asked that the court respond by telling jurors that the justification extended for "a reasonable time" to ensure the danger had passed and sufficient for him "to regain his composure so as to make a decision about how to lawfully dispose of the firearm." The trial court rejected that proposal and instructed the jury that the justification lasted only so long as "the defendant could reasonably believe that he was in imminent danger of death or serious bodily harm." The jury returned its verdict convicting Evans of unlawful possession of a firearm and acquitting him of all other charges shortly after receiving that response.

We conclude that the trial court erred in failing to explain to the jury that one who possesses a firearm in lawful self-defense is permitted some time to, with

reasonable promptness, relinquish the firearm. Whether the person has acted with reasonable promptness in dispossessing themselves of the firearm is itself generally a question for the jury, at least in the seconds or minutes immediately after the need for self-defense has subsided. This is a necessary corollary of the right of self-defense itself, as one who obtains a firearm only because of a need for self-defense cannot reasonably be expected to drop it like a hot potato the moment they recognize that the threat on their life has ceased, nor would it be socially desirable to incentivize them to do so rather than pursuing a more sensible means of relinquishing the firearm. To hold that they must drop the firearm where they stand would effectively nullify the fundamental right to possess even an otherwise unlawful firearm in self-defense.

Because Evans preserved his objection to this instructional error, and because the error was harmful, we reverse Evans's conviction for unlawful possession of a firearm.

## I.

### *The Potomac Gardens shooting*

Saeve Evans met up with his friends, Breyona McMillian and Tajma Dockery, in the outdoor area of the Potomac Gardens apartment complex. The three smoked

a joint while standing between a blue dumpster and a yellow donation bin right next to the complex's parking lot. Once the trio finished the joint, Dockery—who was 16 years old—walked into the parking lot where a friend was waiting to pick her up. A black Nissan then pulled into the parking lot and went straight toward Evans and McMillian. The car "broadsided" with its rear windows rolled down, as if to give those on the passenger's side a direct line of sight to Evans. Multiple shots then rang out, and it seems that some were fired by the occupants of the car and some by Evans. One of the shots struck McMillian in her head and killed her, though it was unclear who fired it. The black Nissan then backed out of the parking lot and drove off, and was later abandoned nearby; it was outfitted with counterfeit plates. Neither Evans nor any of the car's occupants called 911 to report the shooting.

Dockery, who had ducked and closed her eyes when the shooting began, looked up when it stopped and saw that McMillian was dead. Dockery testified that she was scared, her adrenaline was pumping, and she was disoriented. She testified that Evans, too, looked scared. His eyes were wide and his breathing was heavy. Dockery immediately asked him, "did you do that?" Evans replied, basically yelling, "no, they did that," and he then "took off running." Surveillance footage captured Evans holding the gun as he ran from the scene in the seconds after the shooting, but there was no evidence of what he did with the gun once out of frame.

Three surveillance video cameras captured the events in Potomac Gardens from different angles. One camera showed the black Nissan entering the parking lot, driving toward Evans and McMillian with its rear windows down, and then broadsiding and pausing for a second or two. The car then promptly went into reverse and backed out the entire length of the parking lot within a few seconds. The other two cameras show the area behind the blue dumpster. At some point after the shooting started, the footage shows Evans walking backward, pointing and seemingly firing a gun toward the parking lot, and then removing the magazine from the gun and running away, carrying the gun and magazine with him. While it is difficult to pinpoint just how long after the shooting ended that Evans can be seen still in possession of the weapon, it was about three seconds, or roughly the same amount of time it took the black Nissan to back out of the parking lot.

Sixteen cartridge casings were found on the scene, mostly concentrated around where Evans was standing. The government presented an expert who testified that twelve of the sixteen cartridge casings recovered came from a single gun, though he could not say the same of the other four. There was further evidence that both the black Nissan and the dumpster that Evans was standing near showed signs of damage from gunfire. More specifically, metal fragments that surrounded the dumpster and a nearby clothing bin looked like fragments from bullet strikes,

and small marks on the parking-lot-facing side of the dumpster, and on a window behind the dumpster, appeared to be strike marks caused by bullets.

The police ultimately tracked down and spoke to the black Nissan's owner. After multiple interviews with her, she maintained that she lent her car to someone on the day of the shooting but refused to identify that person and refused to give the police consent to search her phone so they could attempt to identify that person. It does not appear that officers ever identified the car's occupants. The police did, however, obtain a warrant to arrest Evans within days of the shooting, and he turned himself in shortly after the warrant issued.

While in jail, Evans had two phone conversations that the government introduced as evidence at trial. First, Evans spoke to Dockery over the phone. During the call he said, "you know what time it is," which Dockery took to mean that Evans knew she would have to testify because she was the only person with Evans and McMillian the day McMillian was killed. Dockery testified that she did not feel threatened by the phone call. In fact, she thought Evans could have been trying to tell her that he didn't blame her for testifying. Second, Evans called a friend and suggested he wanted to give the friend "the ice" because "[o]ne of us might as well look sweet." The government maintained "the ice" referred to a gun, while the defense countered that it was more likely a reference to diamonds or jewelry.

*The trial proceedings*

Evans was charged with first-degree murder while armed, D.C. Code §§ 22-2101, -4502, and -3611; second-degree murder while armed, D.C. Code §§ 22-2103, -4502; possession of a firearm during a crime of violence, D.C. Code § 22-4504(b); and possession of a firearm by a person previously convicted of a crime punishable by imprisonment for a term exceeding one year (felon in possession, or FIP), D.C. Code § 22-4503(a)(1), (b)(1).  He was also charged with two counts of obstruction of justice, in violation of D.C. Code § 22-722(a)(2)(A), (a)(6).

The evidence at trial was largely undisputed: Evans did not dispute that he shot at the car and that he held the firearm for a few seconds after the car had started backing away and as he ran off.  The central dispute was whether Evans had acted in self-defense.  Evans argued that the occupants of the car had started shooting at him first and that he had returned fire only in self-defense.  The government maintained that it was Evans who shot first, because he believed that a man named Sean Shuler was in the car.  Shuler had shot Evans at least sixteen times four years before the Potomac Gardens shooting.  In that prior incident, Shuler exited—in the government's words—"a black car similar to the black car in this case" just before shooting Evans.  Shuler was incarcerated for that shooting, but he had been released to a halfway house mere days before the Potomac Gardens shooting, and the halfway

house's records showed that Shuler had left the house about an hour before the shooting in this case.

The parties unsurprisingly focused their evidence and arguments on the murder charges and the claim of self-defense, with virtually no attention paid to the FIP charge that now lies at the center of this appeal. The government gave the FIP charge only brief attention in its closing argument. It argued that "the ice" Evans mentioned in his jail call referred to a gun and showed that Evans still had the gun after he was arrested. Defense counsel countered that "[t]he only evidence you have in this case of Mr. Evans possessing a firearm is evidence of him using it during self-defense," and "since there is no evidence of him carrying that gun at any point in time, other than the time of which he was being shot at, he is entitled to, has a right to, and is not guilty because he did so in self-defense." In its rebuttal, the government argued that Evans must have had the firearm prior to the shooting, because it would be implausible to believe that Evans had, by "random coincidence," found a firearm on the ground just as he needed to use it in self-defense. The government also argued that Evans was guilty of FIP because "even if you were to consider self-defense, having a gun outside that narrow frame, that takes it outside of self-defense to now possession."

*The jury note and the court's response*

The trial court instructed the jury on the elements of each charged offense, including the FIP charge. After doing so, it read Criminal Jury Instruction 6.501, concerning Evans's defense to the FIP charge, namely, that his possession came in the course of lawful self-defense. That instruction states, in relevant part:

> When a person picks up and uses a firearm during the actual exercise of actual self-defense . . . that person is not guilty of [unlawful possession of a firearm] during the period of actual [self] defense. On the other hand, if a person unlawfully carries or possesses a firearm and then at a later time uses it in actual self-defense, that later lawful use does not make the earlier carrying or possession lawful. Likewise, use of a firearm in actual self-defense does not make carrying or possessing the weapon lawful after the time of actual self-defense.

On the second day of deliberations, the jury sent the following note seeking clarification of that instruction: "Self-defense does not excuse possession 'after the time of actual self-defense.' How long after? A reasonable period of time to ensure that the danger has passed? Or some other standard?" The trial court asked the parties for their positions as to how it should respond to the note. The parties responded with their proposals, first via email.

Defense counsel's emailed response was that "if a person picks up and uses a firearm only in self-defense, there must be some reasonable period of time after the

use of the weapon in self defense for the defendant to be able to dispose of the gun before it becomes unlawful." Citing *Rosemond v. United States*, 572 U.S. 65, 78 (2014), defense counsel elaborated that a person must have sufficient knowledge to allow them to "make the relevant legal (and indeed, moral) choice" after the need for self-defense has ended and that they must have a "realistic opportunity to quit the crime." To capture those principles, the defense proposed the following response:

> Where a person [uses] a weapon in self defense, self defense does excuse unlawful possession of the firearm for such a reasonable time to ensure the danger has passed and for the defendant to regain his composure so as to make a decision about how to lawfully dispose of the firearm.

The government objected to that answer and proposed the following alternative:

> [T]he defense is limited to the time in which the weapon was needed in the immediate exigency [of] self defense or defense of others. . . . It is not available before or after the time of actual self defense.

The parties then returned to court to address the topic within minutes of their emailed responses. In court, the judge proposed the following answer, largely aligned with the government's proposal but excising its "immediate exigency" language:

> With respect to self-defense, the possession of the firearm can be considered to be innocent only for the duration of the need for self-defense. . . . The need for self-defense is present so long as the defendant actually and reasonably believes at the time of the incident that he is in imminent danger of death or serious bodily harm.

The judge stated, "I think [the government is] right" that "[t]he need for self-defense is present [only] so long as the defendant actually and reasonably believes that the weapon was needed to prevent . . . death or serious bodily injury." It then invited defense counsel to explain their contrary view, asking: "Why is that a misstatement of the law?"

Defense counsel then reiterated the legal position that they had already taken in their email. They restated their view that "you can't be guilty of a crime unless you have the realistic opportunity to form the mens rea of it," and that it would not make sense to require somebody to "just drop a loaded gun in the street" the instant they recognize the threat has subsided. They continued that *Rosemond* instructs that a person "has to form the intent and then also have enough time to come down from the—". Before they could complete that thought, the court interrupted that it was not going to give that proposed response because "those instructions are already there. . . . There are instructions about reasonableness and perception. . . . I don't want to repeat every other instruction." The court then pivoted to the government's request to tell jurors that possession could be only for the "immediate exigency [of]

self defense," positing instead that "how long this period of exigency existed" is "a determination that [the jurors] make." Defense counsel said "I don't object to that."

The bulk of the subsequent discussion was focused on the government's request to add the "immediate exigency" language to the court's reinstruction. The government thought it critical to inform the jury that any justified possession was for only "a very finite period." The court rejected that proposed addendum and added a different concluding sentence to its proposal, returning to the idea that it was for the jury to decide how long the defendant might reasonably believe he was in imminent danger, but still providing that the right to possess the firearm in self-defense lasted no longer than that. The court's proposed response read:

> With respect to self-defense, the possession of the firearm can be considered to be innocent only for the duration of the need for self-defense. The need for self-defense is present so long as the defendant actually and reasonably believes that he is in imminent danger of death or serious bodily harm. It is up to you to determine the length of time for which the defendant could reasonably believe that he was in imminent danger of death or serious bodily harm.

Before reinstructing the jury, the court asked whether the response was agreeable to the parties. Both parties said it was "fine" and lodged no further objection. The court confirmed, "[T]his is without objection from either side, correct?" Both parties agreed.

The court then answered the jury's note as set forth above and sent the jury back to deliberate. About forty-five minutes later, the jury returned its verdict convicting Evans of FIP and acquitting him of all of the other charges. The court sentenced Evans to fifty-six months' imprisonment followed by three years' supervised release. Evans now appeals.

## II.

Evans contends that the court's response to the jury note was erroneous and that we should reverse his FIP conviction. The government counters that (1) Evans failed to preserve this issue for appeal, (2) the court's response to the jury's note was correct, and (3) any error was harmless. We disagree with the government at all three steps of its argument, which we now address in turn.

### A. Preservation

We first consider the government's contention that Evans failed to preserve his objection to the trial court's reinstruction of the jury. Whether this objection was properly preserved affects our standard of review. If the objection was preserved, we review the propriety of the trial court's response to the jury note de novo. *Lucas v. United States*, 240 A.3d 328, 342 (D.C. 2020). If the error was not preserved, as

the government maintains, we review it for plain error. *Williams v. United States*, 858 A.2d 984, 990 (D.C. 2004).

To preserve an issue for appellate review, a party generally must raise the complained-of error in the trial court in a manner that is "specific enough to direct the judge's attention to the correct rule of law." *Id.* (quoting *Russell v. United States*, 698 A.2d 1007, 1012 (D.C. 1997)). An objection is preserved even if the defense's own requested instruction was "arguably inaccurate" in some particulars, so long as it "directed the mind of the court to the [correct] legal principle." *Whitaker v. United States*, 617 A.2d 499, 508 (D.C. 1992). The main reason for requiring objections is to "allow the other side to respond and the trial court to correct the error and thereby avoid jettisoning the trial." *Id.* So long as the trial court is "on notice that [a party's] position on the correct rule of law differed from the court's . . . the purpose of the contemporaneous objection rule [i]s satisfied" and the issue is considered preserved. *Wilson-Bey v. United States*, 903 A.2d 818, 828 (D.C. 2006) (en banc) (quoting *Russell*, 698 A.2d at 1012); *see also Hasty v. United States*, 669 A.2d 127, 134-35 (D.C. 1995) (issue preserved where "there was a sufficient record to direct the judge's attention to the correct rule of law" (quotation omitted)).

There is no question that, in their email to the trial court, defense counsel clearly stated the position Evans now takes on appeal. In that email, they articulated

the position that a person who possesses a firearm in lawful self-defense must have a "realistic opportunity to quit the crime" and "a reasonable time . . . to make a decision about how to lawfully dispose of the firearm" before they can be held criminally liable for possessing a gun after the need for self-defense has passed. They even cited case law, *Rosemond*, supportive of that view. They then repeated this request, citing to *Rosemond* again, in court. The government does not contend otherwise. It instead argues that defense counsel abandoned their initial (and repeated) position when they failed to again reiterate it in response to the court's final proposed response. We disagree.

We have already repudiated, on records similar to this one, the government's argument that defense counsel abandons a once-lodged objection by later agreeing to a next-best alternative. For example, in *Zeledon v. United States*, we considered an argument about the meaning of the "serious bodily injury" element of aggravated assault. 770 A.2d 972, 973 (D.C. 2001). Defense counsel asked that the trial court's initial jury instructions tell jurors that the phrase meant "substantial risk of death." *Id.* at 975. The trial court disagreed and opted "not to define the concept at all," leaving it for jurors to decide what constituted a serious bodily injury. *Id.* The jury then sent a note asking for a definition of serious bodily injury. *Id.* The judge offered to supplement her instruction with examples of what had qualified as serious bodily injury in prior cases, but defense counsel objected to that addendum and asked "the

court to simply tell the jury that they are the ones to decide." *Id.* The judge agreed to that request. *Id.*

On appeal, Zeledon complained that the trial court's failure to define "serious bodily injury" for the jury was reversible error. The government countered that the defense had "invited" the judge not to define "serious bodily injury" and therefore had failed to preserve its objection. *Id.* We forcefully rejected this argument, explaining that "it would be quite unreasonable to treat [the defense's] preference that [] the jurors be told 'simply . . . that they are the ones to decide' as abandoning his previous request for a definition of the term." *Id.* at 976. The judge had clearly rejected the defense's first suggestion of defining the term, so the defense was left with two options: giving the jury illustrative examples or not. Suggesting a preference for one of two erroneous choices, rather than continuing to press the view the judge had already rejected, "did not waive [the defendant's] claim of error." *Id.*

Similarly, in *Lucas v. United States*, we found that a claim of instructional error was preserved despite the fact that defense counsel ultimately voiced agreement with the trial court's response to a jury question. 240 A.3d at 345 n.16. *Lucas* involved an assault that was charged as a "bias-related crime" based on the victim's sexual orientation. *Id.* at 333. The trial court initially instructed jurors that for an offense to be a bias-related crime of this type, it must have been committed

"because of prejudice based on the actual or perceived sexual orientation of the other person," and that "it does not matter if [defendants] had additional motives for doing what [they] did." *Id.* at 343-44. During deliberations, jurors sent a note asking: "Does prejudice based on sexual orientation need to be the only [or primary] reason a crime was committed?" *Id.* at 345. Defense counsel first asked the court to respond that bias had to be "the source of the assault." *Id.* at 354 n.1 (Beckwith, J., dissenting) (concurring as to preservation). After that suggestion got no traction, defense counsel relented and suggested that "we just direct them back to the jury instructions," which is what the court did. *Id.* at 353 (Fisher, J., concurring) (concluding error was not preserved).

On appeal, the government argued that the defendants had "waived their challenge [to this jury instruction] by agreeing to the trial court's ultimate decision." *Id.* at 345 n.16. We disagreed because defense counsel put the court on notice of their position and gave the court "the opportunity to correct [its] errors and omissions," and preservation requires no more than that. *Id.* (quoting *Preacher v. United States*, 934 A.2d 363, 369 (D.C. 2007)).

None of the three cases the government cites as contrary authority undermines that principle. The government relies largely upon *Williams v. United States*, in which we held an objection to a jury instruction was not preserved where "*defense*

*counsel stated her preference for* the formulation ultimately given by the court" and the issues defense counsel had "raised were addressed in the final instruction given." 858 A.2d at 990-91 (emphasis added)); *id.* at 993 (the court "gave ultimately the option preferred by the defense"). *Williams* does not help the government for the simple reason that it cannot fairly be said that defense counsel here had "stated [their] preference" for the court's ultimate instruction. It was only after the court had twice voiced disagreement with their repeated proposed instruction—once via email, and once in court—that they expressed "no objection" to their apparent preference among the options still on the table. That did not signal the abandonment of defense counsel's initial proposal; that proposal had simply gotten no traction with the trial court so that the fight had shifted to the government's request to add the "immediate exigency" language.

The government's reliance on *Headspeth v. United States*, 910 A.2d 311 (D.C. 2006), and *Bates v. United States*, 834 A.2d 85 (D.C. 2003), fares no better. In neither case did defense counsel ever object to the trial court's response to a jury note or propose any alternative to it. *See Headspeth*, 910 A.2d at 313, 317; *Bates*, 834 A.2d at 92. In *Headspeth*, defense counsel "did not raise any objection to the trial court's proposed reinstruction to the jury during the discussion of the jury note." 910 A.2d at 318. In *Bates*, the trial judge proposed an instruction and defense counsel said it was "reasonable given it [wa]s in the [form] instructions." 834 A.2d

at 90. And it appears to have been undisputed in both cases—unsurprisingly on those records—that the issues raised on appeal were not preserved so that our review was for plain error only. *Headspeth*, 910 A.2d at 313 ("Headspeth asserts that the trial court committed plain error."); *Bates*, 834 A.2d at 91-92 (making no mention of any dispute as to plain error's application).

Unlike in any of those cases, defense counsel here clearly stated their position in their initial email and again, in a more muddled fashion, in court. Both times the judge skipped over the substance of the defense view that the right to possess the gun *did* extend beyond the need for self-defense—to a "reasonable time . . . to make a decision about how to lawfully dispose of the firearm"—and moved swiftly to considering the contours of how precisely to tell the jury that it did not. The trial court began the in-court discussion by suggesting that "the possession of the firearm can be considered to be innocent only for the duration of the need for self-defense," contrary to the defense's emailed proposal. In response to the court's question as to "Why is [the court's language] a misstatement of the law?", defense counsel reiterated the view that a person must have "the realistic opportunity to form the mens rea" for a crime, that one "wouldn't necessarily just drop a loaded gun in the street," and that a person acting in self-defense must "also have enough time to come down from the [shooting]" before criminal liability attaches. Counsel could not even complete the thought before the trial court squarely rejected that proposal: "those

instructions are already there"—they were not—"There are instructions about reasonableness and perception. . . . I don't want to repeat every other instruction."[1] The court then moved straight on to discussing the government's request for "immediate exigency" language. The discussion of this language lasted until the court gave its final response.

The fact that defense counsel eventually signaled a preference for one of the remaining options on the table (sans the immediate exigency language) over another (with that language) did not negate or abandon their original position. This follows directly from *Zeledon* and *Lucas*, in which defense counsel not only agreed to but in fact advocated for the court's eventual response to a jury note. *Zeledon*, 770 A.2d at 975 (defense counsel asking that the court "tell the jury that they are the ones to decide" what "serious bodily injury" means after the court rejected their initial proposal to define the term); *Lucas*, 240 A.3d at 353 (Fisher, J., concurring) ("Defense counsel . . . suggested that 'we just direct them back to the jury instructions,'" as the court did.). As in those cases, the court had already expressed its disagreement with the defense view, twice over in this case. And as in those

---

[1] Our dissenting colleague glosses over this square rejection of defense counsel's proposal, which precedes each of the defense's failures to object that the dissent highlights. And neither the dissent nor the government defend the trial court's reasoning that those instructions were, in fact, "already there."

cases, the defense's objections were preserved because defense counsel's acquiescence to the better alternative on the table—one without the "immediate exigency" language—cannot fairly be understood as an abandonment of their principal position.

The takeaway from *Zeledon*, *Williams*, and *Lucas* is that a party preserves an issue for appeal so long as the trial court, at the time it rules and on a realistic assessment of the record, is fairly apprised of their position.[2] *See also Holguin-*

_____

[2] In applying this principle, there are cases like *Zeledon* and *Lucas*, where the trial court had already disagreed with counsel's principal position so that counsel's later advocacy for, or acquiescence to, one of the remaining options on the table could not be understood as abandoning the initially stated position. And then there are cases like *Williams*, where defense counsel clearly stated a preference for the trial court's response to her concerns, and thereby abandoned any prior complaint about it. This case falls on the *Zeledon* and *Lucas* side of the line. The dissent counters that "the fact that Williams's counsel preferred [the trial court's ultimate] instruction over [their own initial proposal] was not the core of our holding," *infra* at 60, but we see no basis for that assertion. *Williams* in fact repeated the point— the court "gave ultimately the option preferred by the defense," 858 A.2d at 993— in concluding that "a review of all of the circumstances discloses" that defense counsel abandoned any objection, *id.* at 991. The dissent also miscasts *Zeledon* as a case about the futility doctrine, when in fact *Zeledon* said nothing about futility or how "unequivocal" the trial court's earlier rejection of the defense position was (we did not comment on the trial court's obstinance, or lack thereof). *Infra* at 56. And the dissent then casts *Lucas* aside entirely, positing that it adopted the view "that counsel can *never* abandon an argument, no matter how explicitly he disclaims it, if he has raised it even once." *Infra* at 57. We agree with the dissent that this is "certainly not our law," *id.*, but *Lucas* said nothing of the sort. It instead applied the same guiding principle articulated above, on a record that cannot be meaningfully distinguished (and the dissent does not try to distinguish) from this one, and concluded as we do that defense counsel had preserved their argument for appeal.

*Hernandez v. United States*, 140 S. Ct. 762, 766 (2020) ("By 'informing the court' of the 'action' he 'wishes the court to take,' Fed. Rule Crim. Proc. 51(b), a party ordinarily brings to the court's attention his objection to a contrary decision." (citation omitted)). That standard is satisfied here. Our dissenting colleague disagrees. She does not dispute that this is the relevant guiding principle, but instead treats it as synonymous with the futility doctrine, a distinct concept that we do not rely upon here.

The dissent further contends that defense counsel here should be understood to have abandoned his principal position because—after the trial court twice rebuffed it—defense counsel did not persist in advancing it. But our precedents do not require counsel to press their positions until blue in the face (even if it might be good practice to do so); issues are preserved so long as the trial court was "on notice that [defense counsel's] position on the correct rule of law differed from the court's." *Wilson-Bey*, 903 A.2d at 828; *Holguin-Hernandez*, 140 S. Ct. at 766 (defendant who requests specific sentence need not object after a longer sentence is imposed in order to preserve a challenge to its reasonableness). Defense counsel made sufficiently clear here that their position on the correct rule of law differed from the trial court's, so the issue was preserved.

The dissent also invokes the "core tenet" of "party presentation," *infra* at 58, but its position reduces to mere formalism. This issue would be preserved under the dissent's view if defense counsel had only incanted that they "adhered to their initially stated view," as they no doubt did, when agreeing to the better of the available alternatives on the table. To adopt the dissent's view, then, would be to reduce preservation to a semantic game, detached from the actual interests underlying the doctrine itself. We have consistently rejected that formalistic approach to preservation. *See Graves v. United States*, 245 A.3d 963, 969 (D.C. 2021) ("We will not 'apply plain error review in a rigid fashion which elevates form over the practical dynamics of trial litigation.'" (citation omitted)); *(Gualyn) Williams v. United States*, 966 A.2d 844, 847 (D.C. 2009) ("[T]he plain error rule is not meant to be 'punitive'; instead its purpose is to allow the trial judge 'fully to consider issues and thereby avoid potential error.'" (citation omitted)).

Finally, to the extent the dissent paints a picture of the parties and the trial court as having "engaged in an iterative process" and arriving "at a mutually acceptable instruction," *infra* at 46, we see it differently. The jury's note asked whether the justification for possessing a firearm extends to a "reasonable period of time" after the need for self-defense had passed. Defense counsel emailed a clear response which would have answered that question in the affirmative, that it extends to "a reasonable time . . . so as to make a decision about how to lawfully dispose of

the firearm." Then in court, counsel again—albeit imperfectly, less clearly, and leaving much to be desired in terms of advocating for their position—repeated that the jury's note should be answered in the affirmative: that the justification extended for a period permitting the defendant to "come down from the" attack and "form the intent" to continue to possess the gun because a person cannot be expected to "just drop a loaded gun in the street," which the trial court mistakenly asserted the jury had already been told. Meanwhile, the trial court told the jury that possession of a weapon was justified only for the duration of the need for self-defense, which amounted to answering the question in the negative, as the government preferred (with most of the discussion focused on how exactly to answer it in the negative). The only compromise was about precisely how to answer the jury's question in the negative, with the trial court discarding the defense's repeated proposals to answer it in the affirmative.

## B. Merits

We turn, then, to a de novo review of the judge's response to the jury note. The right of self-defense allows a person to use lethal force if they reasonably believe that they are in danger of death or serious bodily injury. *Dawkins v. United States*, 189 A.3d 223, 232 (D.C. 2018). That defense extends to possessory offenses, where it can justify the otherwise unlawful possession of a firearm. *Wilson v. United States*,

198 F.2d 299, 300 (D.C. Cir. 1952); *Blades v. United States*, 200 A.3d 230, 243 (D.C. 2019). As a general principle, "the law of self-defense is a law of necessity; the right of self-defense arises only when the necessity begins, and equally ends with the necessity." *Mack v. United States*, 6 A.3d 1224, 1230 (D.C. 2010); *accord United States v. Peterson*, 483 F.2d 1222, 1229 (D.C. Cir. 1973). But there is a competing principle that self-defense is grounded in reasonableness and "'rules consistent with human nature.'" *Parker v. United States*, 155 A.3d 835, 844 n.15 (D.C. 2017) (quoting *Brown v. United States*, 256 U.S. 335, 343 (1921)). This case asks us to reconcile those principles on the facts before us.

To recap, the jury's note asked what the initial instruction meant when it said that "[s]elf-defense does not excuse possession 'after the time of actual self-defense.'" It inquired: "How long after? A reasonable period of time to ensure that the danger has passed? Or some other standard?" The judge replied, in relevant part, that a person is justified in possessing a firearm for self-defense only "for the duration of the need for self-defense," which extended only for "so long as [Evans] actually and reasonably believe[d] that he [was] in imminent danger of death or serious bodily harm." In effect, the judge told the jury that Evans's defense to possessing a firearm did not extend to even a moment after the need for self-defense had dissipated; he was required to drop the firearm where he stood the instant he appreciated that the danger had passed, and was not even permitted the time

necessary to relinquish the firearm in a more responsible manner (such as returning it to a lawful owner or unloading it and rendering it inoperable before disposing of it). The justification permitting possession of an otherwise unlawful firearm in self-defense is not so illogically rigid. To interpret it that strictly would eviscerate it.

We hold that persons who procure a firearm in lawful self-defense are not criminally liable for possessing it so long as they dispossess themselves of the weapon with reasonable promptness after the need for self-defense has subsided. What amounts to reasonable promptness in the particular circumstances is often a question for the jury to decide, though it is generally limited to mere seconds or minutes after the right of self-defense has subsided, and does not extend to the hours or days thereafter.

Three reasons compel that conclusion. First, the right of self-defense is grounded in the concept of reasonableness, and it would be unreasonable to require individuals who have just undergone a deadly assault to reflexively drop the gun where they stand the moment they appreciate the threat has subsided. Virtually nobody could comply with that standard, which would gut the fundamental right of self-defense in circumstances like these. Second, while our court has never confronted this precise issue, other courts have persuasively explained that the justification defense must extend for some brief period after the immediate need for

self-defense has subsided, leaving "the reasonableness of the defendant's course of conduct [as] a question for a jury." *United States v. Ricks*, 573 F.3d 198, 204 (4th Cir. 2009). Third, even if one could conceivably comply with the government's preferred instantaneous dispossession rule, that rule would lead to absurdities and incentivize socially undesirable behavior. Requiring a person to drop a loaded gun where they stand the moment they appreciate that the threat has subsided is not sensible. Here, that rule would have required Evans to drop a gun in the middle of a public parking lot right next to Dockery, a minor. Conversely, the government would criminalize far more responsible means of disposal. We now elaborate on each of these points.

*1. Reasonably prompt, rather than instantaneous, dispossession is required.*

First, it is important to bear in mind that the right of self-defense is a pragmatic one grounded in reasonableness. "In evaluating whether a person claiming self-defense acted reasonably under the circumstances the fact-finder must take into account that the defendant was acting in the 'heat of the conflict.'" *(Shirley) Williams v. United States*, 90 A.3d 1124, 1128 (D.C. 2014) (quoting *Brown*, 256 U.S. at 344). As both this court and the Supreme Court have observed, the development of the "law of self-defense has . . . 'tended in the direction of rules

consistent with human nature.'" *Parker*, 155 A.3d at 844 n.15 (quoting *Brown*, 256 U.S. at 343); *Dawkins*, 189 A.3d at 232 (same).

In crafting rules consistent with human nature, we thus cannot demand superhuman decisionmaking or reflexes. It would be neither reasonable nor consistent with human nature to prescribe, upon threat of criminal penalty, that a person who has been compelled to wield a firearm in self-defense must then instantaneously drop it the moment they appreciate that the threat has subsided. We doubt anybody could, or would even think to attempt to, comply with that standard.

The government disagrees. It takes the view that a person whose otherwise unlawful possession of a firearm is justified by self-defense must drop the gun the instant they appreciate the threat has passed (or should reasonably appreciate that). Under this theory, the only way Evans could have avoided a FIP conviction—short of forgoing his right to use it in self-defense in the first place—would be if he had dropped the firearm right where he stood the moment he appreciated he was out of harm's way, presumably the moment when his assailants backed out of the parking lot and drove off. The government's view, as the trial court effectively instructed the jury when responding to its note, is that Evans would be guilty of FIP even if he had quickly disabled the firearm and dropped it in a nearby trash can as he ran from the scene in the seconds after surviving a deadly assault, a possibility that the

evidence did not foreclose (video showed him removing the gun's magazine in the brief seconds after the shooting).[3] That makes little sense and is flatly inconsistent with the reasonable-person standard that undergirds the self-defense doctrine.

It is highly unlikely that any person would have the presence of mind to drop a firearm the moment they realize the threat to their life has dissipated, while they are still enmeshed in the "heat of the conflict." *Dawkins*, 189 A.3d at 232 (citation omitted). It would be "[in]consistent with human nature" to expect someone to be able to think and act so fast, and even if they could, the government's proposal would criminalize far more responsible means of disposal. *See infra* Part II.B.3. We must account for human nature, as the rule we articulate today does, whereas the trial court's response to the jury note erroneously failed to do.

### 2. *Precedents from other jurisdictions generally support our view.*

Other jurisdictions to have considered this issue have likewise rejected the government's instantaneous dispossession rule. Though the tests they have

---

[3] Perhaps he would be guilty of some other offense that prohibits the unsafe disposal of firearms under those facts. But here we are concerned only with the possessory offense, and the extent of any justification for Evans's possession of an otherwise illegal firearm attendant to his right of self-defense.

formulated in its place vary somewhat in their particulars, they generally align with our view.

The most similar case is *Marrero v. State*, in which a Florida appellate court held that a defendant was entitled to a justification defense[4] when he continued to possess a firearm in the moments after using it in self-defense. 516 So. 2d 1052, 1056 (Fla. Dist. Ct. App. 1987). In *Marrero*, an individual tried to rob the defendant at gunpoint. *Id.* at 1053. The defendant wrestled the gun from his assailant, accidentally shooting and disabling him in the process, and put the gun in his pocket as he was still "filled with terror." *Id.* He was found by police "moments later," still in possession of the gun. *Id.* On appeal, *Marrero* held that "the jury must be instructed that where the defendant retains the weapon after the necessity ends, he may not be convicted unless the jury finds that he continued to possess the weapon after he had sufficient time to reflect on the consequences of his possession." *Id.* at 1056.

---

[4] Some courts use the broader term "justification defense" to refer to defenses like self-defense, necessity, duress, and innocent possession. *See Marrero*, 516 So. 2d at 1054 n.3 ("Although most courts agree that certain possessions are justified, there is little agreement on the name the defense is to be called." (citations omitted)). This difference is not relevant for our purposes.

In *United States v. Newcomb*, the Sixth Circuit likewise held that a justification defense extends for a brief period beyond the threat that animated it. 6 F.3d 1129, 1138 (6th Cir. 1993). Newcomb was convicted of the possession of an unregistered firearm and possession of ammunition by a felon. He came into possession of that contraband only after he had taken it from his girlfriend's son, who had threatened to kill someone with it. *Id.* at 1130-31. "[A] few minutes" later, police saw Newcomb place the firearm into an abandoned couch in an alley and then searched him and found the ammunition in his pocket. *Id.* at 1131, 1138. On appeal, the government argued that Newcomb was not entitled to a justification defense because he possessed the weapon for too long after the danger had passed and he could have called the police in those minutes. *Id.* at 1137-38. The court rejected that argument, reasoning that "the emergency situation unfolded rapidly, almost spontaneously, and [] Newcomb's [possession] lasted for mere minutes." *Id.* at 1137. On those facts, the court held that Newcomb had a viable justification defense on which the jury should have been instructed because his possession "at most amounted to a few minutes before the arrival of the police" and "the emergency situation had only ended moments before." *Id.* at 1138.[5]

---

[5] The government highlights that the Sixth Circuit in *Newcomb* also said, in some tension with the just-quoted sentence above, that Newcomb "possessed the ammunition only for the duration of the emergency situation." 6 F.3d at 1138. But it is clear that the court was speaking of "the emergency situation" far more broadly

In *United States v. Mooney*, the Fourth Circuit similarly held that a defendant was entitled to a justification defense where he continued to possess a firearm for some minutes after the danger had passed. 497 F.3d 397, 400 (4th Cir. 2007). Mooney contended that he had taken a gun from his ex-wife, who was threatening him with it. He then called a bar where he worked, rather than calling the police, to tell the owner he was coming by with the gun, with the ultimate intention of summoning police from the bar. Mooney next carried the gun as he walked seven blocks to the bar, where police were already waiting for him because his wife had called them herself. *Id.* Police intercepted Mooney with the weapon and he was charged with unlawfully possessing it. *Id.* The court held that Mooney's counsel rendered ineffective assistance in advising him that he would not be entitled to a justification defense on those facts. *Id.* at 409. The court explained that "it is the *retention* of a firearm, rather than the brief possession for disposal," that obviates the legal justification for procuring it in the first place. *Id.* at 407 (emphasis added).

---

than how the government interprets that phrase, as the opinion makes clear that the girlfriend's son—the threat—had left some minutes before the police arrived on the scene. *See id.* at 1131. In other words, the court held that the emergency situation underlying a justification defense may extend to some reasonable period of time after the immediate threat dissipates, as we effectively hold today.

The Fourth Circuit later made clear, in *United States v. Ricks*, that *Mooney*'s analysis extends beyond cases where an individual is intent on turning the weapon over to police.[6] Ricks and his partner, Blue, got into a fight in their shared living room. 573 F.3d at 199-200. Blue was acting erratically while holding a gun, so Ricks took the gun from him, removed its clip, and then tossed the gun and clip in different directions as Blue ran out of the house. *Id.* After Blue left and the threat had subsided, Ricks retrieved the gun and its clip from where they had separately landed, and then he walked them into the bedroom and placed them on a dresser therein. *Id.* at 200. The government maintained that Ricks's brief period of possession after Blue had fled foreclosed a justification defense. *Id.* at 203. The Fourth Circuit disagreed and held that a justification defense could extend to the period after the threat had dissipated, even though Ricks had no intention of turning

---

[6] The District recognizes a distinct "innocent possession" defense that is applicable only when a person takes possession of a firearm or other contraband—if they find it abandoned in a public space, for instance—with the "intent to take the items to the police as soon as possible." *See Stewart v. United States*, 439 A.2d 461, 463 (D.C. 1981). We are not aware of any jurisdiction that similarly restricts the right to possess a firearm in self-defense to those who intend to turn the weapon over to police immediately after the threat has subsided. *See Ricks*, 573 F.3d at 204 (rejecting "a bright-line rule that the only reasonable way for a felon to dispossess himself of a gun he has justifiably come to possess is to turn that gun over to the police"); *Gov't of Virgin Islands v. Lewis*, 620 F.3d 359, 368 (3d Cir. 2010) (rejecting argument that defendant has "an affirmative obligation to place the gun in the hands of the police before a justification instruction will be appropriate"). The government does not suggest we adopt such a restriction here.

the gun over to the police (who were summoned by Blue). *Id.* at 204. The question, ultimately for the jury, was whether Ricks's "method of dispossession was a reasonable one," though it did not have to be "the only reasonable one." *Id.* at 204.

None of the cases the government cites is to the contrary. The government relies heavily on *Mack v. United States* for the proposition that "the law of self-defense is a law of necessity; the right of self-defense arises only when the necessity begins, and equally ends with the necessity." 6 A.3d at 1230. We have already acknowledged that general principle, but we have never applied it so strictly to the mere seconds after (or before) a deadly assault. It would not make any sense to so rigidly construe it. Indeed, the *Mack* line of cases that the government relies on discusses only the possession of a weapon in anticipation of the need to use it in self-defense, i.e., before a potential attack. *See, e.g.*, *id.* at 1230-31; *Wilson*, 198 F.2d at 300. Possession of a firearm before the need for self-defense presents a very different question, as the person is not confronted with the conundrum of what to do with a gun that has effectively been foisted upon them by the necessities of a life-threatening emergency. *See Murphy v. McCloud*, 650 A.2d 202, 205 (D.C. 1994) (we are not bound by cases in which "the judicial mind" did not "pass[] upon the precise question" at issue).

That difference aside, and contrary to the government's overly literal reading of *Mack*'s pronouncement, the right of self-defense does extend to some seconds or minutes before any strict necessity materializes as well. Our precedents are clear that the right of self-defense is triggered so long as a threat is "imminent"; it need not be present. *Mack*, 6.A3d at 1230. To illustrate, if an armed assailant is beating down your front door intent on shooting you, you need not keep your own available firearm out of reach until the attacker breaches the door or fires their first shot. That is true even if you know that the door will hold for several seconds or minutes—so that it is not strictly speaking necessary to immediately grab the gun—because it would be unreasonable and contrary to human nature to so rigidly circumscribe the right of self-defense.[7] As in other contexts, and "contrary to the teaching of Webster" and other dictionaries, "the key word 'necessity' cannot be interpreted

---

[7] The government persists that *Mack* is to the contrary, and that one cannot hold a weapon in anticipation of the need for self-defense before the point when it is strictly necessary to do so. We disagree. The defendant in *Mack* was not under threat of any imminent attack; he was instead inside his home when he armed himself with an ice pick and went back outside, where he claimed to have some reason to think an assailant might be waiting for him. 6 A.3d at 1227. *Mack* turned on the fact that (1) it could not "candidly be said" that Mack "reasonably believed he was in imminent danger of death or serious bodily injury" when he armed himself, *id.* at 1230-31, and (2) "a defendant cannot successfully claim self-defense when he left an apparently safe haven to arm himself and return to the scene," *id.* at 1231 n.7. That second point was important to our analysis, as we explained that the reason it could not "candidly be said" that Mack believed himself to be in imminent danger was that he affirmatively chose to "step[] out of his house and into the alley" where he claimed to believe an assailant might be lying in wait. *Id.* at 1231.

literally" in this context. *Arizona v. Washington*, 434 U.S. 497, 506 (1978) (discussing "manifest necessity" requirement pertinent to mistrials).

Putting anticipatory self-defense cases aside, the government cites two cases involving possession of a firearm after a justifying event. The first is *Logan v. United States*, 402 A.2d 822 (D.C. 1979), which is inapposite. *Logan* involved an entirely different defense: that of innocent possession, which may sometimes justify the otherwise illegal possession of a weapon where a person removes it from a dangerous situation with the intent to turn it over to police. *Id.* at 825; *supra* n.7. In *Logan*, the defendant claimed that he took a pistol from his cousin because he was concerned the cousin would hurt somebody with it. *Id.* at 824. Police found the defendant walking down the street with the pistol, plus some marijuana and heroin, about five minutes later. *Id.* On appeal, Logan claimed the trial court erred in failing to instruct the jury on an innocent possession defense. We disagreed, concluding that instruction was unwarranted because Logan could not "demonstrate both that he had the intent to turn the weapon over to the police and that he was pursuing such an intent with immediacy through a reasonable course of conduct." *Id.* at 827. Logan did not intend to turn the weapon over to the police at all, foreclosing an innocent possession defense, and instead said he would return it to his cousin once he "was 'in a better frame of mind.'" *Id.* at 828 (Kern, J., concurring).

That holding is irrelevant here, yet the government highlights dicta from *Logan* that describes "a rigid temporal limit" to both innocent possession and self-defense justifications. *Id.* at 826. We do not doubt that there is such a limit—the defendant must act with some urgency to promptly dispossess himself. The limit is simply not so illogically rigid as the government maintains, and *Logan* is not to the contrary.

The government also cites to *Dandridge v. United States*, where the defendant had some unspecified "difficulty" with somebody and responded by carrying a pistol "in his waistband, and [going] across the street, where he sat on a neighbor's steps for over an hour" while armed with the pistol. 265 F.2d 349, 350 (D.C. Cir. 1959). The D.C. Circuit concluded that he had no viable justification defense, concluding that it was "readily apparent" that the "exigencies of the occasion" did not justify Dandridge "in getting the pistol and using it in his self-defense." *Id.* That accords with our holding today. Whatever legal justification might have animated Dandridge's initial procurement of the firearm—it is unclear if there ever was a lethal threat justifying that—sitting with the weapon for more than an hour could not be considered acting with reasonable promptness to dispossess himself of it.

And while the government does not cite to it, *Moore v. United States* is at least arguably supportive of its position, so we examine it as well. 733 F.3d 171 (6th Cir.

2013). Moore was a convicted felon who claimed to have disarmed an attacker and then taken his gun away from the scene in a car occupied by several of Moore's friends. *Id.* at 173. Moore kept the gun on the car's floorboard next to his feet, and shortly after leaving the scene he and his friends were pulled over by a police officer.[8] At that point, Moore did not tell the officer that he had a gun despite having a clear opportunity to do so as the officer waited for backup to arrive. Instead, when additional officers arrived, Moore and the other occupants were directed out of the car and the gun was recovered in a search of it. The Sixth Circuit distinguished *Newcomb*, *supra*, and held that Moore had no viable justification defense because his "possession lasted longer than mere 'moments' after the threat ended" and Moore "refused serial opportunities to hand over the gun" to others, noting that he could have given it to one of his friends in the car or told responding officers about it. *Id.* at 174. Without opining on whether *Moore* was correctly decided under the test we announce today, it is enough to say that unlike in *Moore*, there was no evidence here that Evans's possession "lasted more than mere 'moments' after the threat ended," *id.*, and also unlike in Moore, there is no basis to say Evans passed on "serial

---

[8] The opinion does not specify how long after the claimed attack Moore was pulled over by police, but in his brief Moore posited that it was about "three minutes" later. Amended Brief for Appellant, Nos. 12-6437 & 12-6438, 2013 WL 1291192, at *8, *32, (March 21, 2013).

opportunities" to dispossess himself of the gun.[9]  The critical bases on which *Moore* distinguished *Newcomb* thus do not apply here.

### 3. *The government's view would incentivize socially undesirable behavior.*

The government's position would also lead to absurd results and incentivize socially undesirable behavior.  We offer a couple of examples to illustrate the point.

Imagine you're at a friend's house, and you know they lawfully keep a gun (that you cannot lawfully possess) in their nightstand.  You hear a commotion outside and see your friend is being attacked by a man wielding a large knife and slashing at your friend.  You grab the gun, run outside, and scream "stop or you're dead!," causing the attacker to drop the knife and run away.  With the attacker out of sight and now disarmed—you've also secured the knife—you are confident that the threat is over.  Under the government's view, if your first move is to go check on your friend to see if they have been stabbed, and to call for an ambulance if they have, you have committed a felony.  If they have been stabbed and you call for an ambulance, and you then promptly walk the gun back up to your friend's room and

_____

[9] The only person on the scene whom Evans might have been able to give the gun to was his friend Tajma Dockery.  But Dockery was merely 16 years old at the time and therefore (1) could not legally possess a firearm in the District, D.C. Code § 7-2502.3(a), and (2) giving her a firearm would itself have been a felony punishable by up to ten years' imprisonment, D.C. Code § 7-2507.06(a)(1).

place it back in their nightstand, you are still a felon. But you are innocent of any offense if instead you immediately toss the loaded gun into the public street and walk away from the scene. If you act more carefully and conscientiously, then you are a felon under the government's test; if you act more recklessly, you are absolved.

Or consider a person who is walking down the street when an armed assailant holds them up with a revolver. They manage to disarm and then point the gun at their assailant, scaring them off so that the imminent danger has subsided. At that moment, the government would say that the person has committed no offense if they simply toss the loaded gun in the street and walk away. But they are a felon if they instead do something far more responsible, and within minutes they: (1) remove any ammunition from the revolver, (2) knock out its cylinder, rendering it inoperable, and (3) spread the gun's component parts across nearby trashcans. Once again, it is the more socially desirable behavior that would be punished as a felony, while leaving the more reckless actor entirely innocent.

These are the results of the government's position, and they are not sensible. When it comes to the mere moments after a person has been compelled to wield a firearm in self-defense, the far better view is that a jury should be tasked with assessing whether their next steps in dispossessing themselves were prompt and reasonable. While there are outer bounds to that assessment—the person must act

with reasonable promptness, in recognition of the fact that they are in possession of contraband—the government would strip that assessment from the jury in favor of an overly rigid rule that is out of step with reason, human nature, and caselaw.

At bottom, we agree with Evans that the trial court erred when it told the jury that the justification defense extends only "so long as the defendant actually and reasonably believes that he is in imminent danger of death or serious bodily harm." Instead, the justification for possessing a firearm in self-defense extends to a short period after the person realizes the threat has subsided, permitting them a reasonable opportunity to promptly dispossess themselves of the weapon.[10] The trial court's failure to instruct the jury to that effect was error.

---

[10] Evans advanced a slightly different response to the jury's note before the trial court, but the minor differences between that proposal and the rule we adopt are of no moment. We have repeatedly "observed that a request for an instruction may be sufficient even if it was not made with 'consummate clarity.'" *See Whitaker*, 617 A.2d at 507 (quoting *Moore v. United States*, 599 A.2d 1381, 1387 (D.C. 1991)). Even an "arguably inaccurate" requested instruction may be "sufficient to direct the judge's attention to the correct rule of law" provided it "directed the mind of the court to the [relevant] legal principle." *Id.* at 508. And here, both before the trial court and on appeal, Evans has advanced the relevant principles critical to our holding today: (1) that "there must be some reasonable period of time after the use of the weapon in self defense for the defendant to be able to dispose of the gun before it becomes unlawful," and (2) that people cannot be expected to instantaneously drop a firearm where they stand after fending off a deadly attack.

## C.  Harm

Because the judge's instruction was erroneous, the final question is whether that error was harmless.  It was not.

As an initial matter, the parties disagree over what standard of review to apply to this question.  Evans maintains that the error here was of a constitutional dimension, so that in order to conclude it was harmless, we "must be able to declare a belief that it was harmless beyond a reasonable doubt."  *Chapman v. California*, 386 U.S. 18, 24 (1967).  The government counters that this instructional error is subject to the harmless error analysis under *Kotteakos v. United States*, under which we need only have "fair assurance, after pondering all that happened without stripping the erroneous action from the whole, that the judgment was not substantially swayed by the error" to declare it harmless.  328 U.S. 750, 765 (1946).  We need not resolve this threshold dispute because, assuming as the government maintains that *Kotteakos* applies, we have no fair assurance that this error was harmless.

The circumstances surrounding the jury's verdict make it quite likely that its question, and the court's answer to it, was a controlling one as to the FIP charge.  The jury had been deliberating for two days before sending its note, and returned its verdict acquitting Evans of all counts but the FIP charge within forty-five minutes

of receiving the court's response. There is no question, given the various acquittals, that the jury concluded that Evans was acting in self-defense when he shot at the black Nissan, or at least that it could not find to the contrary beyond a reasonable doubt. It is also evident from the jury's note that, for whatever reason, it was not convinced that Evans's initial procurement of the firearm was unlawful, because if it had been convinced of that it would have had no cause to focus on the period after the shooting. It thus seems that the FIP charge turned on the question the jury asked: how long after the shooting might Evans be justified in possessing the firearm?

We have no fair assurance that the jury would have convicted Evans had it been told that his justification defense persisted, after the need for self-defense had subsided, for a period necessary for him to dispossess himself of the gun with reasonable promptness. There was virtually no evidence that Evans continued possessing the firearm beyond the few seconds as he fled from the scene in the shooting's immediate aftermath. The trial court's response to the jury note would have permitted jurors to convict him for that fleeting period of possession, and we think it is reasonably likely that the jury did just that. Whereas a properly instructed jury would almost certainly conclude that those few seconds fit comfortably within the period necessary for one to dispossess themselves with reasonable promptness.

The government counters, as it stressed in its closing argument, that the "evidence showed that [Evans] offered to give the gun (the 'ice') to a friend months after the murder." But the jury pretty clearly did not buy that account, because its question of whether self-defense extended to a "reasonable period of time to ensure that the danger has passed" would make little sense if it did. The defense also offered a plausible explanation that "ice" instead referred to diamonds or jewelry, which would make a lot more sense of Evans's followup statement that "[o]ne of us might as well look sweet." More importantly, even if we found Evans's jail call referencing "ice" more compelling than we do, it is still not for us to "substitute our judgment for that of the jury." *Weiler v. United States*, 323 U.S. 606, 611 (1945). Nothing gives us confidence that this jury believed, beyond a reasonable doubt, that Evans possessed the weapon beyond the few seconds immediately after the shooting. We therefore have no fair assurance that the error was harmless.

## III.

We reverse Evans's conviction.

*So ordered.*

ALIKHAN, *Associate Judge*, dissenting: As I read the trial record, Mr. Evans, through counsel, affirmatively waived his challenge to the court's instruction in response to the jury's note. I would thus leave the possession question—a tricky one worthy of a better record—for another day.

## I.     Facts

After the jury came back with a note asking for clarification on how long possession of a firearm is justified after an act of self-defense, the parties offered competing proposals and engaged in an iterative process with the trial court to arrive at a mutually acceptable instruction. During those conversations, Mr. Evans's counsel, James King, was given several opportunities to object to the final version of the instruction responding to the jury's note, and—on three different occasions—he affirmatively disclaimed any objection in response to the court's solicitation of feedback. In my view, Mr. Evans thereby waived any challenge to the court's instruction, and the instruction is reviewable only for plain error.

The majority presents a different picture—one in which the trial court failed to engage with the substance of Mr. King's objection and left him with no choice but to acquiesce to the court's final proposal—but a closer look at the record contradicts that characterization and instead reveals a productive discussion about how to respond to the jury's note which culminated in Mr. King's acceptance of the

ultimate instruction without objection. The facts, as I understand them, are as follows.

After the jury submitted its note, the parties proposed responses over email. Mr. King requested that the jury be instructed that a defendant has "reasonable time to ensure the danger has passed and . . . to regain his composure so as to make a decision about how to lawfully dispose of the firearm," whereas the government sought language limiting innocent possession to the "immediate exigency" of self-defense. The parties then returned to the courtroom and engaged in a long discussion about how best to craft a responsive instruction. The court began by proposing one of its own, which, as the majority points out, mirrored the government's proposal more closely than Mr. King's. The court's proposal read in relevant part that possession of a firearm is "innocent only for the duration of the need for self-defense" and that "[t]he need for self-defense is present so long as the defendant actually and reasonably believes at the time of the incident that he is in imminent danger of death or serious bodily harm."

The court gave the government the first chance to respond. Government counsel explained that the proposed instruction did not "explain what the duration of the need is," which was the thrust of the jury's question. Relying on commentary accompanying Criminal Jury Instruction 6.501, she requested that the court replace

"at the time of the incident" with "in which the weapon was needed in the immediate exigency of self-defense," which the court took under consideration. Government counsel also asked that the court add language that the innocent-possession defense "is not available before or after the time of actual self-defense," which the court rejected because the jury had indicated through its note that it was "plainly cognizant of that part."

The court then heard from Mr. King. While Mr. King could have advocated for the instruction he had proposed over email, he did not. Instead, he objected to the government's proposal to add language about an "immediate exigency" and asked that the second sentence of the court's proposed instruction be changed to "[t]he need for self-defense is present so long as the defendant actually and reasonably believes at the time of possession that he is in immediate danger of death or serious bodily harm." Government counsel countered that this did not resolve her concern "that this is a very finite amount of time that the defendant is able to claim innocent possession."

At this point, the court paused the discussion. It explained its view that "[t]he need for self-defense is present so long as the defendant actually and reasonably believes that the weapon was needed to prevent . . . death or serious bodily harm," and asked Mr. King, "Why is that a misstatement of the law?" It was only at this

point that Mr. King mentioned that a defendant needs time to form the mens rea to possess the weapon apart from the self-defense need. The court responded that it had already instructed the jury along those lines—"about reasonableness and perception"—and did not want to be repetitive, and Mr. King did not argue otherwise. Then, in an effort to accommodate Mr. King's concern, the court proposed adding a sentence explaining that it was ultimately "up to [the jury] to determine how long th[e] period of exigency existed, or how long [Mr. Evans] actually and reasonably believed it to be necessary" and "to make it clear that it's a determination that [the jury] make[s]."

Mr. King responded: "I don't object to that." That was his first accession to the proposed instruction. Government counsel did not voice an objection either, but she did repeat her view that the period of permitted possession for self-defense must be limited to "an immediate exigency," that the window cannot be "just any reasonable duration," and that "it ha[d] to be immediate . . . [and] very finite." In response, Mr. King began arguing affirmatively *in favor* of the court's instruction. He responded to government counsel that "it's still a subjective interpretation." Government counsel and the court then entered into a somewhat lengthy conversation about the functional difference, if any, between "immediate exigency"—the language preferred by government counsel—and "imminent danger

of death or serious bodily harm"—the language in the court's instruction, which was acceptable to Mr. King.

Ultimately, the court suggested to government counsel an instruction limiting the permissible window to as "long as the defendant actually and reasonably believes the weapon was needed to prevent the imminent danger of death or serious bodily harm," which government counsel said was "fine." The court took a brief recess to write down a revised instruction.

When the court returned, it passed out printed copies of the new instruction, which read as follows:

> With respect to self-defense, the possession of the firearm can be considered to be innocent only for the duration of the need for self-defense.
>
> The need for self-defense is present so long as the defendant actually and reasonably believes that he is in imminent danger of death or serious bodily harm.
>
> It is up to you to determine the length of time for which the defendant could reasonably believe that he was in imminent danger of death or serious bodily harm.

Government counsel again stated that this instruction was "fine." And when the trial court asked whether the instruction was "agreeable" to the defense, Mr. King responded with an unambiguous "Yes." Moments later, after the court read the new

instruction aloud, Mr. King again stated "I think that's fine," and then voiced a separate concern that is not relevant to this appeal. That was the second time Mr. King expressly agreed to the court's proposal.

To put an even finer point on the parties' agreement with the proposed instruction, the court informed the parties that "without objection" it was "going to give this instruction," and asked the parties one final time, "this [instruction] is without objection from either side, correct?" Government counsel answered that she had already "stated [her] concerns." Interjecting, the court sought to clarify whether this was an objection, or simply a "concern." She replied, "[n]o objection, Your Honor." The court then turned to Mr. King, asking whether there was "[a]ny objection from the defense." Mr. King responded unambiguously, "No, Your Honor," now agreeing with the instruction for the third time. The court then read the instruction to the jury.

## II.    Discussion

### A.    Waiver

The primary thrust of the majority's preservation discussion is that the court repeatedly rejected the language that Mr. King preferred such that any further objection would have been fruitless. In an effort to refute that characterization, I begin with where it appears that the majority and I agree. Without a doubt, a party

does not abandon an argument by failing to press it when doing so would be futile. *Mercer v. United States*, 724 A.2d 1176, 1183 (D.C. 1999).[1]  We thus held in *Zeledon v. United States*, 770 A.2d 972 (D.C. 2001), that after a court unequivocally rejected an argument, a party did not waive that point by later agreeing to one of the court's alternative proposals.  *Id.* at 975-76; *see In re Melton*, 565 A.2d 635, 637 n.3 (D.C. 1989) (holding further objection unnecessary where the court "clearly indicat[ed] that he rejected the arguments raised by the objections"), *reh'g granted and opinion vacated sub nom. In re Melton*, 581 A.2d 788 (D.C. 1990), *opinion superseded on reh'g*, 597 A.2d 892 (D.C. 1991).[2]  And although the majority does not explicitly say so, I also take us to agree that a court is allowed to express tentative disagreement about a party's position without actually "rejecting" it, such that

---

[1] The majority believes that the futility doctrine has no place in our analysis. *Supra* at 23.  Respectfully, I disagree.  This doctrine simply restates a concept on which the majority and I concur: that despite facially appearing to consent to a court's decision, a party does not actually manifest agreement to that decision when it is clear that any further disagreement would be futile.  *Mercer*, 724 A.2d at 1183. The majority and I simply part ways when it comes to whether further objections would have been ineffectual in this case.

[2] *Accord United States v. McElmurry*, 776 F.3d 1061, 1067 (9th Cir. 2015) (explaining that the court's "definitive in limine ruling preserved the matter without the need for further objection" at trial); *Gov't of the Virgin Islands v. Joseph*, 964 F.2d 1380, 1385 (3d Cir. 1992) ("[T]he district court made a definitive ruling with no suggestion that it would reconsider the matter at trial." (internal quotation marks omitted)).

counsel can subsequently waive the objection by agreeing to alternative language. *Williams v. United States*, 858 A.2d 984, 991 (D.C. 2004); *accord United States v. Rico*, 864 F.3d 381, 384 (5th Cir. 2017) (holding defendant to his waiver of objections not re-raised after a tentative denial).[3]  Our disagreement then boils down to which side of the line—definitive rejection vs. tentative discussion—this case falls.

I see it as the latter.  At no point did the court clearly, unequivocally reject Mr. King's argument such that "it [was] plain that a further objection would be unavailing."  *Thoma v. Kettler Bros.*, 632 A.2d 725, 727 n.3 (D.C. 1993) (quoting 9 Charles Alan Wright, et al., Federal Practice and Procedure § 2553 (1971)).  The court instead discussed its proposed instruction with the parties in an effort to reach

---

[3] If the majority were instead endorsing the principle that once an objection is made, it can never be rescinded, waived, or forfeited, that would be out of step with cases both in our court and nationwide.  *See, e.g.*, *Griffin v. United States*, 850 A.2d 313, 318 (D.C. 2004) (reviewing an argument for plain error when counsel initially objected but later withdrew the objection); *Slye v. United States*, 602 A.2d 135, 140 & n.9 (D.C. 1992) (declining to consider request for instruction that was raised at a pre-trial hearing but not renewed at trial); *Deneal v. United States*, 551 A.2d 1312, 1316 (D.C. 1988) (reviewing for plain error where counsel raised an instructional error, stated his intention to develop it further, and then failed to do so); *accord United States v. Gabriel*, 831 F.3d 811, 814 (7th Cir. 2016) ("Where the district court has already made a decision and said definitively that it is imposing certain conditions of supervised release, a defendant need not take an 'exception' to preserve the issue for appeal.  But a district court can announce a tentative decision or view and invite objections.  A failure to object in those circumstances can amount to waiver." (citations omitted)).

a mutually agreeable solution—a solution that Mr. King thrice found acceptable. Although the majority does not clearly state precisely *when* it believes the court "rejected" Mr. King's argument—as opposed to provisionally announcing a point of disagreement—I will take each of the three possible instances seriatim.

First, the majority makes much of the fact that the court kicked off the discussion by recommending an instruction that was more similar to the government's than Mr. King's. But this alone cannot be a definitive ruling so as to render further objections futile. For one thing, such a rule would eviscerate a court's ability to reach a consensus on a substantive dispute, as presumably *any* proposed solution by the court—no matter how explicitly tentative—would operate as a "rejection" and render all contrary positions permanently live. *But see supra* n.1; *see Small v. Sayre*, 384 P.3d 785, 788-89 & n.7 (Alaska 2016) ("[A] discussion is not a ruling."). For another, the court immediately solicited comments on its proposal, indicating an intent to engage in an interactive discussion rather than issue a definitive decision.

Second, the court stated its view that "[t]he need for self-defense is present so long as the defendant actually and reasonably believes that the weapon was needed to prevent . . . death or serious bodily harm." Again though, the court signaled its intention to further discuss the issue with Mr. King rather than announce a final

ruling, as immediately after announcing this view, it again solicited Mr. King's feedback by asking him why the court's inclination was a "misstatement of the law." This too cannot operate as a definite repudiation of Mr. King's position, or else *any* tentative disagreement by a court would.

Finally, after Mr. King raised his concern about the need for a defendant to form the mens rea to possess the firearm apart from the self-defense need, the court responded that its earlier instructions had already accounted for that concern.[4]  This reads to me as another statement of the court's own substantive view and an offer to continue to work together to find a solution—not a clear indication about what final instruction it would give.  This interpretation seems especially apt because immediately after the court conveyed its view, it proposed an amendment to the instruction that it hoped would "respond to [Mr. King's] concern with regards to the language."  Mr. King was clearly satisfied with that amendment—which would instruct the jury that it was ultimately for them to decide how long the period of exigency existed—because he repeatedly agreed with it without ever returning to his previously proposed language.  In light of what I read as the court's discussion about—rather than definitive rejection of—the parties' views on the proper language

---

[4] The majority asserts that the trial court's earlier instructions had not actually addressed Mr. King's concern.  *Supra* 21-22 & n.1.  If Mr. King shared that view, one would have expected him to raise it with the court.

to include in the instruction, and in light of Mr. King's ultimate acquiescence to the final instruction as given, I would hold that Mr. Evans waived a challenge to the instruction.

With the above understanding in mind, *Zeledon* is plainly distinguishable, as the trial court's rejection was truly unequivocal there. 770 A.2d at 975. During the initial jury instruction hearing, defense counsel argued that "serious bodily injury" should be defined in a certain way. *Id.* The court opted not to define the term at that juncture but indicated that it might revisit that decision if the jury sent a note asking for a definition. *Id.* The jury did eventually send such a note after it began deliberating. *Id.* But instead of inviting further discussion on the issue as the court did here, the *Zeledon* court immediately announced its final decision: there was "no question" that it needed to tell the jury "that it [wa]s for [them] to decide what qualifies as serious," i.e., the court still refused to define the term. *Id.* The court then offered to provide the jury with some other examples of serious bodily injury, but defense counsel indicated its "preference . . . for the [c]ourt to simply tell the jury that they are the ones to decide." *Id.* (second alteration in original). On appeal, we held that in the face of the court's square rejection of any proposal to define "serious bodily injury," defense counsel's choice between the lesser of two evils did not amount to a waiver. *Id.* at 976. But that definite repudiation out of the gate is a

far cry from the productive discussion that occurred here, even if Mr. King did not receive exactly what he had originally wanted.

Nor does the footnote on which the majority relies in *Lucas v. United States*, 240 A.3d 328 (D.C. 2020), offer its position any support. *Id.* at 345 n.16. In that footnote, we explained that the defendants had not waived a challenge to the court's jury instructions by "agreeing to the trial court's ultimate decision to reiterate the [original] jury instructions" because the court "had the opportunity to correct errors and omissions which otherwise might necessitate a new trial." *Id. Lucas* thus seems to suggest that counsel can *never* abandon an argument, no matter how explicitly he disclaims it, if he has raised it even once. That is certainly not our law, *see, e.g.*, *Zeledon*, 770 A.2d at 975-76 (treating preservation and waiver as distinct concepts); *Griffin v. United States*, 850 A.2d 313, 318 (D.C. 2004) (reviewing argument for plain error when counsel initially lodged an objection but later withdrew it), and the majority does not even defend such a sweeping view. And to the extent that *Lucas* conflicts with *Zeledon* and *Griffin* by ignoring waiver as distinct from preservation, *Zeledon* and *Griffin* control as the earlier decided cases. *Fleming v. United States*, 224 A.3d 213, 219 (D.C. 2020) ("A division of th[is] court cannot overrule a prior decision of the court."). So *Lucas* provides the majority scant aid.

Beyond specific cases, concluding that Mr. Evans waived his challenge on these facts is consistent with two overlapping judicial doctrines. The first of these is issue preservation, made manifest in this case through Super. Ct. Crim. R. 30, which provides that "[a] party who objects to any portion of the instructions or to a failure to give a requested instruction must inform the court of the specific objection and the grounds for the objection before the jury retires to deliberate." *Id.*; *see Robinson v. United States*, 649 A.2d 584, 586 (D.C. 1994) ("Rule 30 is equally applicable to reinstructions."). "The purpose of this timely exception rule is to give the trial court the opportunity to correct errors and omissions which otherwise might necessitate a new trial, thus discouraging counsel from purposefully withholding objections." *Deneal v. United States*, 551 A.2d 1312, 1316 (D.C. 1988). Certainly, Mr. King's initial objection served Rule 30's purpose by providing the trial court the opportunity to craft a revised instruction based on both parties' feedback. But if counsel continued to object to the revised instruction, he needed to make that known.

The next doctrine is party presentation, which is a "core tenet" of our legal system. *Deloatch v. Sessoms-Deloatch*, 229 A.3d 486, 493-94 (D.C. 2020); *see* Jeffrey M. Anderson, *The Principle of Party Presentation*, 70 Buff. L. Rev. 1029, 1029 (2022). According to this principle, in our "fundamentally . . . adversarial system," *Deloatch*, 229 A.3d at 492, "we rely on the parties to frame the issues for decision and assign to courts the role of neutral arbiter of matters the parties present,"

*id.* (quoting *Greenlaw v. United States*, 554 U.S. 237, 243 (2008)).  Waiver is the other side of that coin: when a party has decided *not* to frame an issue for us by intentionally relinquishing it, we should, as the neutral arbiter of what the parties bring to us, decline to decide that issue unless the party can meet the high bar of showing plain error.  *See Wood v. Milyard*, 566 U.S. 463, 470 n.4 (2012) (noting that waiver looks to whether "a party has knowingly and intelligently relinquished" a claim).

It is evident that party presentation played a role in the court's decision to give the instruction it did.  The court asked for substantive input several times, and Mr. King readily and repeatedly agreed with the revised instruction that was borne out of that discussion.  The trial court thus had no reason to think any objection remained: it had allowed Mr. King an opportunity to frame and present the case as he wished, and he explicitly chose not to bring a challenge to the court's final instruction.  Mr. King could have cleaved to his specifically requested language— even if just to note his objection for purposes of appeal, *see Romero v. United States*, 266 A.3d 217, 221 (D.C. 2022) (reiterating objection for the record)—but he did not. I am aligned with the majority in believing that we cannot and should not "reduce preservation to a semantic game."  *Supra* at 24.  But it would contravene core precepts of our legal system to ignore counsel's objectively manifested accession on this particular record.  Crucially too, waiver does not render an issue unreviewable

in our jurisdiction. Under our cases, we may still review the trial court's instruction for plain error to correct any egregious missteps, *Williams v. United States*, 858 A.2d 984, 991 (D.C. 2004), but we should not, in the absence of a preserved objection, lessen our standard of review.[5]

The majority's reasoning also seems to betray a misunderstanding of the concept of waiver. It presupposes, relying predominantly on *Williams*, 858 A.2d at 990-91, that a party can only waive an argument if it expresses a *preference* for a new solution over its original. As an initial matter, the fact that Mr. Williams's counsel preferred one instruction over another was not the core of our holding. *Id.* at 991. We deemed his argument waived because his counsel presented "no . . . challenge to the [court's] final re-instruction"; the fact that she preferred that formulation simply explained why, as a factual matter, she did not object. *Id.* More fundamentally though, the majority's rule regarding preference is simply not what waiver is. Waiver is more fairly characterized as a party's acceptance of something as "good enough" rather than preferable. That is because it looks to whether a party, whatever their reason, relinquished an issue they could have continued to press. It does not hinge on whether the party preferred a different position over the one to

---

[5] Of course, if the waiver is the result of ineffective assistance of counsel in a criminal case, there remains the remedy of post-conviction relief under D.C. Code § 23-110.

which it agreed. Such a view would render waiver nearly a dead letter, as parties are frequently *satisfied* with a middle-ground solution—but they rarely *prefer* it. *See, e.g.*, *United States v. Fulford*, 267 F.3d 1241, 1246-47 (11th Cir. 2001) (holding that a party had waived his challenge to an instruction by indicating that the court's proposal was "acceptable," even though he would have preferred different language).

As a final note, the majority's articulation of the preservation rule it discerns from cases like *Zeledon*, *Williams*, and *Lucas*—"that a party preserves an issue for appeal so long as the trial court, at the time it rules and on a realistic assessment of the record, is fairly apprised of their position," *supra* at 22, is true enough. But when a party does not "fairly apprise" the trial court that there is lingering disagreement or an unresolved issue, the issue is not preserved. For example, in *Thorne v. United States*, 582 A.2d 964 (D.C. 1990), the defendant filed a pre-trial motion to sever, which the motions judge did not rule on, and the defendant failed to remind the trial judge of the pending motion and did not renew it on the basis of any evidence at trial. *Id.* at 965. We held that "[a] party who neglects to seek a ruling on his motion fails to preserve the issue for appeal." *Id.* So too here.

## B. Merits

Because Mr. Evans waived his claim of instructional error, our review is for plain error. *Williams*, 858 A.2d at 991. "Under the test for plain error, appellant must show error, that is 'plain,' that affected [his] substantial rights, and that seriously affects the fairness, integrity, or public reputation of judicial proceedings." *In re T.M.*, 155 A.3d 400, 405 (D.C. 2017). The length of time during which a felon may possess a firearm after engaging in self-defense was not settled by the time the trial court gave its instruction, as the majority's opinion acknowledges. *Supra* at 26. The court's instruction was thus not sufficiently "clear and obvious" to constitute plain error. *In re T.M.*, 155 A.3d at 405.

## III. Conclusion

I respectfully dissent.